# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:                                          Case No. 21-40083-tjt

LOVES FURNITURE INC.                            Chapter 11
d/b/a LOVES FURNITURE AND MATTRESSES,
a Delaware corporation,                         Hon. Thomas J. Tucker

      Debtor.

_____/

## DECLARATION OF MACK PETERS IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF

I, Mack Peters, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am the major shareholder of M P Furniture, Inc. ("MPF") which is in the business of offering consulting services within the retail and wholesale furniture industry. Through MPF, I have traveled extensively through Asia to source furniture manufacturers and then broker deals between the manufacturer and large furniture retailers. Through a contract between MPF and Loves Furniture, Inc. (which does business as Loves Furniture and Mattresses) (**"Loves"**), I am currently functioning as an independent contractor as the Interim Chief Executive Officer of Loves Furniture, Inc. and have been since November 20, 2020.

2.      I have more than forty years of experience in the furniture industry in manufacturing, wholesale and retail aspects of the business. I started and operated my own furniture retail chain for twenty years and sold it to one of the largest furniture manufacturers in the country. I was brought on by Loves to leverage my retail, manufacturing and wholesale

IBLOOMFIELD\999999999\0400\3050853.v1-1/10/21

experience to make Loves sustainable and profitable.

3.      On December 26, 2020 Loves hired B. Riley Advisory Services ("B. Riley Advisory") and other consultants to further assist Loves in a potential restructuring of the business.

4.      On January 6, 2021 (the "**Commencement Date**"), the Debtor commenced with this court (the "**Court**") a voluntary case under chapter 11 of title 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**"). I am knowledgeable and familiar with Loves' day-to-day operations, business and financial affairs, books and records, and upon information and belief, the circumstances leading to the commencement of these chapter 11 cases.

5.      I submit this declaration (this "**Declaration**") to assist the Court and parties in interest in understanding the events and circumstances that led to the commencement of these chapter 11 cases and in support of the motions and applications that the Debtor has filed with the Court, including the first day pleadings filed concurrently herewith (the "**First Day Pleadings**"). I am authorized to submit this Declaration on behalf of the Debtors. Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by Loves' employees, advisors, or attorneys, or based upon my experience, knowledge, and information concerning Loves' operations and the retail furniture industry. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

6.      The Debtors have requested a variety of relief in the First Day Pleadings to minimize the adverse effects of the commencement of these chapter 11 cases. I am familiar with the contents of each First Day Pleading and I believe the relief sought therein is necessary for the Debtors to transition into chapter 11. I further believe that the relief requested in the

First Day Pleadings will preserve the value of the Debtor's estate.

7.	This Declaration focuses on matters directly relevant to the First Day Pleadings. However, additional history of Loves' is set forth in the Appendix to this Declaration.

## I.
## Overview

8.	Loves Furniture Inc., d/b/a Loves Furniture and Mattresses is a Delaware corporation with its principal place of business in Macomb County Michigan. Loves' owner is US Assets, Inc. ("US Assets"), a Nevada corporation which is wholly owned by T & L Financial, Inc., which is 94.01% owned by Jeff Love a Texas resident. Additional background on Jeff Love and how he came to form Loves is detailed in the Appendix.

9.	Initial financing for the venture was expected to come from contributions from US Assets supplemented by financing through STORE Capital, a major landlord of Loves retail locations.

10.	The Debtor next built its management team. A first hire was Matthew Damiani ("**Damiani**") a former Vice President at Art Van who held a variety of operations roles with Art Van. Damiani also had been responsible for logistics for Staples for 15 years in a variety of positions. Damiani was hired as Loves' CEO on April 13, 2020.

**Employees**

11.	Loves' second hire, was its Director of Human Resources on April 13, 2020. The two worked together to obtain the talent that would be needed to create a start-up furniture company. At that point in time, Loves had no stores, no office, no phones or equipment and in the midst of a shut-down order due to the COVID-19 pandemic. Loves was created at the kitchen

3

tables of its first employees. More detail on the initial formation of Loves is available in the Appendix.

**Loves Leased Properties and Associated Expenses**

12.     On May 4, 2020, Loves entered into four master leases with STORE Capital for a total of twenty-three locations: Lease 1 for McMurray, Pittsburgh, Harrisburg, Leesburg, Altoona, Towson and Mt Pleasant) for $4,989.152 per year; Lease 2 for Woodridge, Taylor, Portage, Saginaw, Petoskey, Royal Oak and Columbus for $6,112,321 per year; Lease 3 for Port Huron, Bay City, Waterford and Warren South (8 Mile and Schoenherr) for $2,680,478 per year and Lease 4 for Schaumberg, Shelby, Howell, Livonia and Burton for $4,099,051 per year. The initial plan was to first open stores in Michigan and the Pittsburgh and Toledo metropolitan areas to start and eventually expand to cities such as Schaumberg, Woodridge, Columbus, Towson, Leesburg and Harrisburg. However, the leases for these locations were included in the lease bundles presented by STORE Capital. As part of the leases, STORE Capital leases provided Loves with $2,760,000 in Tenant Improvement ("TI") dollars.

13.     Likewise, on May 5, 2020, Loves executed a master lease with SCF RC Funding ("**Essential")** for properties formerly occupied by Art Van in Battle Creek, Muskegon, Westland and Ann Arbor. The annual rent for these locations was $3,600,000 and Essential offered $500,000 in TI.

14.     Art Van left inventory at each of the STORE Capital and Essential locations. On May 4, 2020, Loves entered into an Asset Purchase Agreement (see Bankruptcy Case No. 20-10553-CSS, 478-1 in the District of Delaware) for the inventory at these locations. This purchase was approved by the Bankruptcy Court in an May 8, 2020 order. STORE Capital loaned Loves the money to purchase the inventory which was secured by a promissory note dated May 1, 2020,

4

in the amount of $5,290,000.  On May 28, 2020, Loves entered into an agreement with Planned Furniture Promotions ("PFP") to sell this inventory.  Ultimately, Loves received approximately $7,000,000 from the sale.  In addition, to the amount received from the sale, PFP paid the rent, insurance, labor and other expenses for locations at which the sales were held during the term of the liquidation sales thereby eliminating the financial obligations to Loves.

15.     At this time, Loves expanded its portfolio of location, as described in detail in the Appendix.  This created further opportunity, but also capital requirements for the new enterprise.

16.     Many of the Loves stores required updating had not been updated for many years.  Some were out of code and needed significant work to obtain certificates of occupancy.  Liquidation sales had been held on some of the premises prior to Loves obtaining the tenancy and were left damaged.  In some locations, fixtures that should have remained in the stores had been ripped out causing additional damage.  This created additional expense to repair damage, bring each location up to code, renovate each location, and install COVID-19-required barriers.  The total cost of refurbishments was $4,084,780, some of which remains unpaid as of the Petition Date.

17.     Loves also incurred additional costs for the removal of the former Art Van external signage from each location and for the installation of new Loves signs.  Some of these amounts remain unpaid as of the Petition Date.

**Inventory**

18.     Loves Chief Merchandising Officer was hired on May 4, 2020.  Loves focused on modern stylish furniture in a variety of price points, and an array of mattresses from top of the line Temperpedic, Stearns and Foster and SSB, to mid-market and value priced brands.  Loves ordered a total assortment from 81 different manufacturers for an aggregate landed cost of more

IBLOOMFIELD\999999999\0400\3050853.v1-1/10/21

than $60,000,000 and received approximately $38,000,000 of that. The rest was either canceled by the manufacturer due to non-payment or sold to another retailer.

19. Loves has paid approximately $17,200,000 towards its inventory and approximately $22,500,000 remains unpaid. Other inventory ordered has been reclaimed by vendors or sold to third parties.

20. Currently there is more than $10,000,000 in inventory in the Loves Warehouse. There remains approximately $6,400,000 in inventory in the twelve remaining stores.

**Warehousing and Delivery Issues**

21. As with most retail furniture companies, Loves store locations does not generally sell merchandise from the floor. Rather store locations display an assortment of goods available for purchase which would then be shipped to the customer from a centralized warehouse or delivered to the store for customer pick up. Issues with Warehousing and logistics related to Loves' opening and expansion are responsible for much of Loves' financial problems. Detail about these issues are contained in the Appendix.

22. As the Appendix explains in detail, the warehousing and logistics related to Loves' initial inventory and sales was disastrous, causing Loves loss of substantial sales and serious damage to Loves' reputation.

23. Loves opened its first seven stores on or about August 28, 2020. Initial feedback, including on social media, was positive: customers lauded the stores, the merchandise and the customer-centric method of selling. Reviews shortly turned negative as Loves experienced issues delivering retail inventory. As customer merchandise could not be located, frustrated customers canceled orders. This also resulted in negative comments related to Loves' ability to deliver merchandise on social media which also resulted in diminished traffic to the stores.

6

24.     Loves attempted to arrange for store-direct deliveries, however that did not alleviate the problem.  For a customer to pick up goods from a store, the merchandise needed to be located in a warehouse and then delivered to the store.  Often the inventory could not be located. If located but in multiple warehouses, Loves would be charged multiple shipping fees.  Even if the inventory was in one place and could be located, there was a substantial cost for store delivery, reducing Loves' operating profit.  Multiple "touches" increased damages with both no clarity as to where and when the damage was caused.

25.     Loves' defective inventory and logistics system was also staggeringly expensive. To date, Loves has paid a total of $8,310,227.83 to Penske alone.  According to Penske, more than $1,800,000 remains outstanding although the amount and Loves' liability to Penske is disputed.

26.     Loves hoped that once it moved into a single warehouse and stocked each of its newly opened stores with initial merchandise, the warehouse would be more organized and that an accurate account of goods and their location would be realized.  However, that was not the case.

27.     Loves continued to pay Penske current plus a portion of arrears until December 4, 2020 when it did not have sufficient cash to make the full payment.  On December 7, 2020, Penske provided notice that it would walk off the job and "would schedule the immediate sale of Loves' inventory" within the next 10 days if payment was not made immediately.  Loves disputed the validity of Penske's claim that it possesses a warehousemen's lien on Loves' inventory but made a payment of $401,000 the following day and Penske remained working.

28.     Loves was dissatisfied with Penske's management of its warehouse for the reasons stated in this Declaration and the Appendix.   However, Loves could not immediately terminate the contract because it would take an estimated 30 to 60 days for Love to relabel merchandise to convert from the Penske WMS to a new WMS provided by Storis.

29.      In mid-December, Loves was a day late with its weekly payment to Penske. Loves and Penske verbally agreed to terminate their agreement effective January 31, 2021 pursuant to a termination agreement to be negotiated between the parties. The parties further agreed to payment schedules designed to pay Penske in full by January 31, 2021.

30.      Loves made the payments due until December 28, 2020, when it did not have sufficient cash to make the arrears payment. Loves notified Penske that it was unable to remit the payment.

31.      On December 29, 2020, at 3:00, Penske removed its employees and trucks and refused a request to permit Loves to use Penske's WMS to locate merchandise in the 1 million square foot warehouse to fulfill customer orders.

32.      As a result, all customer deliveries which had not been pulled were suspended and Loves was required to cancel all further customer deliveries. This resulted in significant numbers of customer demands for refunds further negatively impacting Loves' available cash and the viability of its business.

33.      On January 6, 2021, Penske filed suit against Loves for its past due balance. It also filed a Motion for Temporary Restraining Order and Emergency Hearing seeking to prevent Loves from moving or delivering items in its warehouse.

**Attempts to Restructure and Obtain Additional Financing**

34.      By early November, and for the reasons set forth in this Declaration and the Appendix, Loves' debts were mounting. Although Loves solicited additional capital from a variety of sources, ultimately all attempts at additional financing failed. Short-term financing was obtained through merchant cash advances.

8

35.    Because of the expense of delivering goods to the Pennsylvania market from Loves' warehouse in Warren, Michigan, Loves exited the Pennsylvania market, by leasing its 5 stores to Levin Furniture.  As part of this transaction, Loves obtained a termination of its leases for Pittsburgh, McMurray, Mt Pleasant Altoona and State College.  Levin also purchased Loves' inventory at those locations, with the proceeds used to refund customer deposits on any goods not delivered.

36.    Loves continued to explore ways to reduce its expenses and bring in additional income.  Loves also looked at further refining its footprint to three major areas and consolidating stores within those areas.  On or about December 3, 2020, an agreement was entered into with PFP, which had previously liquidated the Art Van inventory purchased by Loves from the Art Van bankruptcy estate, to liquidate the inventory at 13 Loves locations:  Waterford, Livonia, Burton, Saginaw, Bay City, Muskegon, Port Huron, Petoskey, Dearborn and the three Youngstown-area stores.  Under an agreement similar to the first PFP liquidation, PFP agreed to liquidate the inventory at these stores and became responsible for payment of rent, insurance, labor, advertising and other sale related expenses during the term of the sale.  Profits under the agreement are shared between Loves and PFP.

37.    The stores selected to remain open after December 3, 2020 were the largest stores and those that had historically high sales with previous retail tenants.  The current operating Loves locations are:  Shelby Twp., Taylor, Howell, Canton, Royal Oak, Warren North (14 Mile), Portage (Kalamazoo), Battle Creek, Grand Rapids, Comstock Park (Alpine), Jackson and Toledo.

38.    With the reduction in the number of stores, Loves also reduced headcount to only those individuals needed to support a 12 store footprint.  Those reductions were effective on December 21, 2020.  Further reductions took place on January 7, 2021.

9

## PART II:

## FIRST DAY MOTIONS:

A. Debtor's Emergency Motion For Entry of Interim Order Authorizing (A) Use of Cash Collateral Pursuant to 11 U.S.C. §363, (B) Permitting Use of Inventory Potentially Subject to Security Interests and Liens and Preventing Interference With Such Use, and (C) Granting of Superpriority Claims and Adequate Protection (the "Cash Collateral Motion")

39. The Debtor urgently requires use of cash collateral to maintain operations integral to the successful restructuring of the Debtor, for maximizing the value of the Debtor's estate, minimizing the claims against the Debtor pursuant to the provisions of chapter 11 of the Bankruptcy Code.

40. The Debtor's most valuable, and most liquid, asset is inventory. The success of the Debtor's Chapter 11 case depends on its ability to convert its inventory to cash to pay expenses of administration and to fund payments to creditors.

41. The Debtor's books and records show that its assets, as of the Petition Date, consist of the following in the approximate amounts listed:

| CURRENT ASSETS | |
|---|---|
| Cash and Short-Term Investments | 50,000 |
| | |
| Accounts Receivable | 50,000 |

IBLOOMFIELD\999999999\0400\3050853.v1-1/10/21

| | |
|---|---|
| Inventories | 27,000,000 |
| Prepaid Expenses and Others | <u>100,000</u> |
| TOTAL CURRENT ASSETS | 27,200,000[1] |
| | |
| | |
| PROPERTY AND EQUIPMENT | |
|    Lease Improvements/Signage | 5,800,000 |
|    Computer Software and Hardware | 2,800,000 |
|    Fixtures | 2,900,000 |
|    Vehicles | 100,000 |
| | |
| LESS: ACCUMULATED DEPRECIATION | 200,000 |
| PROPERTY AND EQUIPMENT – NET | 11,400,000 |
| | |
| **TOTAL ASSETS** | <u>**38,600,000**</u> |

42. As noted above, the inability to turn its inventory into cash is the major cause of the Debtor's bankruptcy.

43. The Debtor has too much inventory and too little cash to operate its stores without an infusion of cash for inventory.

---

[1] Currently the Debtor estimates it owns approximately $27,000,000 of inventory. There is more than $11,000,000 in inventory in the Loves Warren, Michigan warehouse and more than $6,000,000 in inventory in the twelve remaining stores. The remaining inventory relates to liquidation sales initiated prior to the Petition Date and prepaid inventory not yet received by the Debtor.

44.	To remedy this issue, and to fund its Chapter 11 case, on January 8, 2021, the Debtor expects to enter into a Sale Promotion Consulting Agreement (the "Consulting Agreement") with PFP which sets forth the terms of sales with PFP. Upon Court approval of the Consulting Agreement, PFP will pay the Debtor the sum of $2,500,000, with additional compensation to the Debtor coming through the terms of the Consulting Agreement.

45.	In addition, in connection with its sales at the Debtor's locations, PFP will pay operating expenses of the Debtor's business locations, including rent, insurance, utilities, advertising and other expenses as set forth in the Consulting Agreement. This will substantially reduce the cash burden on the estate.

46.	All of the Debtor's inventory to be sold under the Consulting Agreement is cash collateral. Accordingly, to obtain the benefits of the Consulting Agreement, and to use the proceeds of the sales under the Consulting Agreement, the Debtor needs authority to use cash collateral The following is a list of the parties (the "Cash Collateral Secured Creditors") holding known existing liens against Debtor's cash collateral:

| Creditor | Nature of Lien | Cash Collateral | Amount[2] | Disputed? |
|---|---|---|---|---|
| Store Capital Acquisitions, LLC ("Store Capital")[3] | Contractual | Substantially all assets at locations leased from Store Capital (Exhibit "6-1") | $1,273,000 | No |
| Argyle Acres | Contractual | All assets used on or related to premises leased from Argyle Acres (Exhibit "6-2") | $23,628 | Yes |
| A & R Properties | Landlord Lien by Statute | Assets at locations leased from A & R Properties (Exhibit "6-3") | $72,443 | Yes |
| Preferred Furniture Promotions ("PFP") | Contractual | Inventory, purchase money security interest on any inventory bought by PFP | $0 | No. |
| Toronto Dominion Bank | Contractual | Accounts due from Toronto Dominion Bank (Setoff Rights) | $0 | No |
| Penske Logistics | Warehouse Lien | Inventory located at the Debtor's | $1,608,893 | Yes |

---

[2] To the best of Debtor's knowledge, these are amounts owed as of the Petition Date.
[3] Store Capital may have also used the following names: Store Master Funding XII, LLC, Store SPE AVF I – 2017-1, LLC

| | | warehouse location. | | |
|---|---|---|---|---|
| Kuehn and Nagel | Carrier's Lien | Inventory being shipped through Kuehn and Nagel | $2,970,817[4] | No |
| Westwood Capital Funding | Contractual | All assets, including inventory and accounts | $603,470 | No |

47.　　As adequate protection of liens against the Debtor's inventory, the Debtor is offering replacement liens to the same extent, and with the same priority as existed on the Petition Date for all Cash Collateral Secured Creditors.

48.　　Replacement liens will provide the Cash Collateral Secured Creditors with liens on the proceeds of the sale of inventory.　The Cash Collateral Secured Creditors bargained to be paid in cash, not in furniture.　If the Debtor is not able to sell their Cash Collateral and to use the proceeds to fund this case and pay creditors, its only option will be pay the Cash Collateral Secured Creditors by turning over inventory collateral with a value sufficient to pay such Cash Collateral Secured Creditors' claims.

49.　　This would not be in the interest of the estate because the valuation of inventory turned over to a Cash Collateral Secured Creditor as payment would likely

---

[4] The full amount claimed by Kuehne and Nagel may exceed $3,400,000.　It appears the difference between figures relates to timing of invoices.

be measured at forced liquidation value, while the Debtor expects to realize substantially more than forced liquidation value from the sale under the Consulting Agreement.

50. I believe that the best interests of all parties are served by the Debtors' proposed adequate protection and use of cash collateral.

B. Debtor's First Day Motion For Entry of Interim and Final Orders (I) Authorizing the Debtor to Enter Into the Consulting Agreement, (II) Authorizing and Approving the Conduct of Store Closing Sales, With Such Sales to Be Free and Clear of All Liens, Claims and Encumbrances, (III) Authorizing and Approving the Store Closing Procedures and (IV) Granting Related Relief (the "Consulting Agreement Motion")

51. Through the Consulting Agreement Motion, Loves seeks authority for the Debtor (a) to enter into that certain Sale Promotion Consulting Agreement dated as of January 7, 2021, by and between the Debtor, Planned Furniture Promotions, Inc. ("PFP") and Hilco Merchant Resources, LLC ("HMR") (a contractual joint venture of PFP and HMR, the "Agent"[5]), (the "Consulting Agreement"), a copy of which is attached to the Consulting Agreement Motion; (b) authorizing and approving the initiation of 25 store closings or similar themed sales at the stores listed on Schedule 2 to Exhibit 6-1 to the Motion (collectively, the "Sales", "Closing Stores", or "Store Closings"); (c) authorizing and approving the terms of the store

---

[5] In accordance with the Consulting Agreement, the Agent is syndicating the transaction with Gordon Brothers Retail Partners, LLC ("GBRP") and SB360 Capital Partners, LLC ("SB360"). For all purposes, references herein to the "Agent" shall include PFP, HMR, GBRP, and SB360.

IBLOOMFIELD\999999999\0400\3050853.v1-1/10/21

closing procedures (the "Store Closing Procedures"), annexed as Schedule 3 to Exhibit 6-1; and (d) granting related relief.

52. As previously noted, since its inception, the Debtor has been working with PFP to liquidate excess inventory as and when needed to provide the Debtor with operating cash and to reduce operating expenses.

53. PFP is a specialized liquidator focused on inventory sales. Besides the Debtor, PFP has engaged in planned furniture promotions for other parties, including Art Van and dozens of other furniture stores (a list of some of PFP's successes can be found on its webpage at **https://pfpnow.com/listen-to-our-clients/?gclid=CjwKCAiAxeX_BRASEiwAc1Qdkdw1JxNEkVjJtggrLfzM0io X0OSvnAkwcYoMh8hvPhKT6MFbKZZ1nBoCnlUQAvD_BwE**.

54. In connection with its priority inventory sales and this sale, the Debtor has engaged in discussions with other potential liquidators and has determined that PFP is the most appropriate party to liquidate excess inventory due to its extensive experience in the industry, its reasonable terms and its history with the Debtor and its inventory.

55. The Debtor has determined in its business judgment that (a) the services of the Agent are necessary (i) for a seamless and efficient large-scale store closing process, as is contemplated by this Motion, (ii) to maximize the value of the saleable Company Inventory (as defined in the Consulting Agreement), (iii) to determine if

16

sufficient funds can be raised to effect a restructuring of up to 12 stores after the Sales; and (b) the Agent is qualified and capable of performing the required tasks in a value-maximizing manner.

56. The scope of the Agent's services and fees are described in the Consulting Agreement Motion. These services and fees are reasonable and necessary to conduct a successful inventory liquidation event, and provide the estate with its best opportunity for a successful Chapter 11 case.

57. In my experience in the industry, relief from any local laws governing the conduct of store closing, liquidation, or other inventory clearance sales, including (but not limited to) state and local laws, statutes, rules, regulations, and ordinances (the "Liquidation Sale Laws"), and any contractual prohibitions that could otherwise inhibit or prevent the Debtor from maximizing value for creditors through the Store Closings is critically necessary to a successful sale.

58. Further, my experience informs my conclusion that the Store Closing Procedures provide protections to landlords and other parties that are typically concerned about liquidation sales and conform with the general objectives of Liquidation Sale Laws to prevent disruption of local government interests.

59. While it may seem contradictory that the Debtor seeks to conduct liquidation sales events to reorganize a core of its business operations, it is not. In fact, the only route to a reopening of any store locations is the accumulation of

sufficient proceeds from the sales to fund a reopening. Without a means of converting inventory to cash, the Debtor has no reasonable likelihood of maintain operations or reorganizing.

  C. First Day Motion For Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Continue To Operate Its Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Maintain Existing Business Forms, and (II) Granting Related Relief (the "Cash Management Motion")

60. In order to ensure that the Debtor's Chapter 11 case is successful, it is critical that its operations face the minimum possible disruption. According, through the Cash Management Motion, the Debtor seeks to maintain its prepetition bank accounts through the interim period prior to the Consulting Agreement's approval and for limited purposes throughout the Chapter 11.

61. The Cash Management System is designed to control funds, ensure cash availability, and reduce administrative expenses by facilitating the collection and control of Debtor's funds. Any disruption of the Cash Management System would be materially detrimental to the Debtor's operations, as its business requires prompt access to cash and accurate cash tracking.

62. As of the Petition Date, the Cash Management System consists of two bank accounts (the "Bank Accounts"), both of which are located at Chase Bank, N.A. ("Chase") The Cash Management System is centralized around a main

operating account (account number ending in 0309 (the "Primary Operating Account") at Chase Bank, N.A. and a secondary account. (the "Secondary Account") While both accounts are used to collect incoming funds from its stores. Disbursements are made only from the Primary Operating Account. The Bank Accounts are identified on *Exhibit 6-1* to the Cash Management Motion.

63.     Requiring the Debtor to adopt a new, segmented cash management system during these chapter 11 cases would be expensive, burdensome, and unnecessarily disruptive to the company's operations.

64.     New bank accounts would increase operating costs, and the delays that would result from opening new accounts, revising cash management procedures, and redirecting daily store deposits would negatively impact the Debtor's ability to operate its business while pursuing these arrangements.

65.     In this case, the maintenance of the Cash Management System is temporary, pending approval of the Consulting Agreement. After approval of the Consulting Agreement, the Debtor's accounts will have little activity during the liquidation sales, but may need to remain open to facilitate receipt of certain pre-petition payments and other funds due to the estate. The Debtor will work with the U.S. Trustee's office to ensure that all further arrangements are permitted by the U.S. Trustee or the Court.

66.　I have reviewed the other requests made in the Cash Management Motion related to maintaining business forms, use of electronic funds transfers, payment of bank fees and similar fees and other matters. These requests are reasonably necessary to permit the Debtor to operate in the ordinary course of business, and best fulfill its duties under the Bankruptcy Code.

**D.**　First Day Motion For Entry of Interim and Final Orders (I) Approving Form of Adequate Assurance of Payment to Utility Companies, (II) Establishing Procedures For Resolving Objections By Utility Companies, (III) Prohibiting Utility Companies From Altering, Refusing or Discontinuing Service, (IV) Authorizing, But Not Directing, Debtor To Pay Prepetition Critical Utility Costs and (V) Granting Related Relief (the "Utilities Motion")

67.　To operate their business and manage their properties, Debtor obtains telecommunications, waste disposal, water, gas, electricity and other utility services (collectively, the "Utility Services") from a number of utility companies (collectively, the "Utility Companies") that are identified in Section IV of the Utilities Motion.

68.　As of the Petition Date, to the best of Debtor's knowledge, $855,078.00 is due to the Utility Companies. Based on their monthly average for the twelve months prior to the Petition Date, Debtor estimates that their cost of Utility Services for the next thirty days will be approximately $250,000.

69.     If the Consulting Agreement is approved, as part of that sale, PFP

would be responsible for payment of utility costs at the operating locations.  Under

the circumstances, the Utility Companies should be paid their post-petition bills, and

extensive deposits should not be required.

70.     Uninterrupted Utility Services are essential to Debtor's ongoing

operations and, therefore, the success of Debtor's Chapter 11 case.

71.     I believe that the Deposits Proposed in the Utility Services Motion

provide security to the Utility Companies while preventing interference with the

Debtor's Chapter 11 case.


**E.**     Motion For Entry Of Interim and Final Orders Authorizing Debtor to
(I) Pay Prepetition Employee Wages, Salary and Other Compensation
and Reimbursable Employee Expenses and (II) Continue Employee
Benefits Programs. (the "Payroll Motion")

72.     The Debtor pays wages and other compensation to its employees every two weeks

in arrears which has averaged approximately $980,000 per pay period.

73.     In light of recent reductions, Debtor expected payroll for both corporate office and

stores to be approximately $360,000 for the January 23, 2021 payroll and to be further reduced to

approximately $160,000 on the payroll date of February 6, 2021.

74.     The Debtor's first post-bankruptcy payroll was due on January 8,

covering the work period from December 20, 2020 to January 2, 2021 (the

21

"Prepetition Payroll").  Employees have been advised that the Debtor is seeking Court approval of payment of the Prepetition Payroll.

75.    The Debtor maintains a number of commission programs to incentivize performance among its sales Employees, primarily in the form of sales commissions for store sales associates (collectively, the Commissions") Sales associates also receive a draw (an advance on commission payments) which is reconciled against sales.

76.    The Debtor estimates that it currently has approximately $85,000 in outstanding obligations to Employees on account of the Commissions which the Debtor seeks authority to pay in a manner consistent with historical practice

77.    The Debtor also has withholding expenses related to payroll, including federal and states taxes, child support, garnishments, 401(k) deductions.   The amounts of these withholding expenses are as specified in the Payroll Motion and are an essential, indivisible part of the Debtor's payroll.

78.    Prior to the Commencement Date, several key officers of the Debtor, including the CEO and CFO resigned.  The Debtor replaced those necessary officers with independent contractors, including myself.   In addition, the Debtor uses contractors to fulfill IT and other critical functions (together, the "Independent Contractors").   I believe the authority to continue paying their Independent Contractors is critical to maintaining and administering its estate. These individuals

22

could experience significant financial hardship if the Court does not permit the Debtor to continue paying their compensation.

79. As of the Petition Date, the Debtor estimates that it owes approximately $55,000 on account of unpaid independent contractor payments (the "Unpaid Contractor Amounts"), all of which will come due within the first 7 days of this chapter 11 case.

80. Finally, in the Payroll Motion, the Debtor seek authority to pay certain ancillary fees, including payroll processing fees, employee reimbursable expenses and fringe benefits. The amounts due are set forth in detail in the Payroll Motion, and are truly a part of the employee wages that should be paid.

81. The Debtor does not believe any Employee is owed Employee Compensation and Benefits in excess of the $13,650 priority wage cap imposed by section 507(a)(4) of the Bankruptcy Code (the "Priority Cap") and does not seek to pay unpaid Employee Compensation and Benefits to any Employee in excess of the Priority Cap by this Motion. Similarly, no fringe benefits or other expenses are owed in excess of the priority cap under section 507(a)(5) of the Bankruptcy Code.

82. The Debtor believes that payment of the items set forth in the Payroll Motion are critical to the success of its Chapter 11 Case.

I declare under penalty of perjury that the foregoing is true and correct and if called upon can testify to the same.


/s/ Mack Peters_____
Mack Peters
Interim CEO, Loves Furniture, Inc.


Dated:   January 10, 2021

IBLOOMFIELD\999999999\0400\3050853.v1-1/10/21

**APPENDIX TO DECLARATION OF MACK PETERS:**

Part 1: Jeff Love and the Formation of Loves Furniture, Inc.:

1.      Jeff Love is the president of US Assets.  US Assets has been in the real estate business for approximately 10 years.  US Assets is also acquires small businesses and retains the existing management staff to run the business.  Through his acquisition work, Jeff Love became acquainted with representatives of STORE Capital and Essential Properties, landlords for some US Assets properties.

2.      Sometime in February or March 2020, representatives from STORE Capital and Essential Properties approached US Assets about the possibility of leasing several of its properties formerly occupied by Art Van Furniture, LLC. (**"Art Van"**) which was then in bankruptcy.  They indicated they expected that the leases would soon be rejected by the Art Van Chapter 7 estate and they were looking for new tenants.  The parties also discussed the fact that Art Van and its sister corporation Levin Furniture (**"Levin"**) still had significant sales when it filed bankruptcy, and had left a void in the retail furniture market in the areas previously serviced by those locations.

3.      Jeff Love, on behalf of US Assets, then began discussions with STORE Capital and Essential Properties about the possibility of setting up a start- up retail furniture corporation in former Art Van and Levin locations.  The parties engaged in discussions of lease bundles which would be covered by master leases for a total of twenty-three STORE Capital locations and three owned by Essential Properties.  The majority of the leases were in Michigan with others in Pennsylvania, Ohio, Maryland, Virginia and Illinois.   The plan was to develop furniture stores in these locations as well as add other stores within the same market areas to reduce incremental expenses such as for advertising.

25

Part II – Loves Creates a Staff

4.      By April 30, 2020, Loves had hired its first leadership team comprised of a Chief Buyer, Chief Information Officer and E-Commerce Director, Warehouse Director, CIO, Chief Marketing Officer, Head of Stores and Director of Consumer Finance and a Director of Financial Planning and Analysis.

5.      Each of these individuals was responsible for setting up systems to support the initial 26+ stores that would be opened in the next 4 to 6 months, as well as to hire the employees needed to run these operations.  In mid-May, the Company hired a Director of Real Estate to negotiate the specific terms of leases as well as to identify potential sites for additional stores within similar geographic areas of the original 23 stores and a potential site for a warehouse.  On May 26, 2020, Loves hired its first CFO who resigned to take another offer after only two weeks. He was replaced by an interim CFO shortly thereafter.

6.      After Loves entered into its first leases in May 2020, the staff, working from an empty showroom in Royal Oak, Michigan prepared to begin operations.

Part III – Loves Expands its Initial Footprint

7.      As Loves' new staff coalesced, Loves continued to round out its portfolio of locations in Michigan, especially in metro-Detroit.   On May 29, 2020, Loves entered into a lease with Agree Ltd. Partnership for the former Art Van Canton Michigan location, in a high-visibility location that had a history of strong sales performance for Art Van. .  The rent is $1,339,626.36 a year paid monthly. Agree provided Loves with $250,000 in TI dollars   The Canton store opened on August 28, 2020 and was one of the first locations opened by Loves.

8.      Thereafter Loves continued to add additional properties.  For the most part, its intention was to round out existing markets.  However, on July 30, 2020, Loves entered into three

26

leases for properties in the Youngtown area of Ohio/Pennsylvania (the "Youngtown Leases"), a new market for Loves. The landlord for these stores is A & R properties. The annual rent for these properties was $869,200 and no TI was offered.

9. Loves rounded its portfolio by entering into other leases at locations profitable for the former Art Van or Levin. It entered into a lease with SBV-Holland LLC for property located in Holland, Ohio, a suburb of Toledo and a sublease with JJWSC for a property previously located in State College, PA.

10. LCN was the landlord of Art Van's warehouse and corporate offices located in Warren, Michigan. Beginning in May, Loves began discussions with LCN about the possible lease of the warehouse and corporate offices formerly leased by Art Van. However, prior to Loves ability to occupy the warehouse and corporate offices, American Signature, Inc. ("ASI" which operates furniture stores under the Value City name) purchased Art Van's inventory and had the right to conduct liquidation sales at the location where the inventory was kept including and to use the former Art Van warehouse through September 30, 2020. This left Loves without a warehouse until October 1, 2020. On that date, Loves began its lease of the Warren warehouse from LCN at an annual rental of $1,840,136.25 paid quarterly at $710,034.06. It also entered into leases for newly rejected leases on other LCN properties at Kentwood, Comstock Park and Warren locations.

11. On October 7, 2020, Loves leased a former Art Van location in Jackson Michigan from Argyle Acres for $182,796,96 a year. This was the last store to be leased by Loves. It opened to the public on December 19, 2020.

Part IV – Logistics and Warehousing

12.     The store locations do not have space to house all of Loves' furniture inventory. Loves Furniture ordered its first product in June and was scheduled to receive orders beginning as early as mid-July. Loves would not have access to the Warren warehouse until October 1, 2020, and even then would not be immediately able to receive inventory.

13.     When it became clear that Loves could not have access to the Warren warehouse before orders arrived, Loves began looking for temporary warehouse space. Loves also sought a vendor to manage its warehouse and to provide cartage services for goods moving from the warehouse to the stores. Ultimately, Penske Logistics Services was selected. Since goods were on their way, Loves urgently needed a location to store inventory until it received access to the Warren warehouse in October. Most items were purchased in bulk (i.e. 100 sofas) and vendors were not willing to split the shipment between multiple locations. Even if the vendors had been willing to ship directly to stores, most stores were not in a position to be able to receive merchandise (some were holding liquidation sales of former Art Van inventory, others had construction work going on). Penske located a warehouse in Burton, Michigan (the "Burton warehouse") that had 412,630 square feet of storage space available for temporary lease. Although Loves only wanted space until October, the landlord was only willing to lease space for a minimum term of 6 months. Originally, Penske was going to lease the Burton warehouse and would then charge a mark-up to Loves on the rent. Instead, Loves leased the Burton warehouse directly. It entered into an agreement for the Burton warehouse on July 17, 2020. Under the terms of the lease it paid a $215k monthly rental for 6 months plus a $215K security deposit.

14.     Loves signed an agreement with Penske on July 20, 2020 that was effective as of July 17, 2020. Although Loves was using Storis as both its POS and financial reporting systems, which came with a WMS that was included in its cost and was integrated into the POS and

financial systems, Penske insisted on using its own WMS to avoid the expense of training its employees on Storis. This required Loves to build integrations between Storis and Penske's WMS.

15. Because Loves was a startup corporation with no established credit, Penske requested some form of payment assurances. Ultimately the parties agreed that Loves would pre-pay $1,000,000 as a deposit which it did on July 23, 2020. The amount was determined to be slightly above the anticipated monthly total fees for both warehouse and cartage. Each month, the monthly payment would be deducted from the deposit and Loves would replenish the amount so that $1M deposit would cover costs for the following month.

16. It quickly became clear that the Burton warehouse was not large enough to hold all of Loves incoming orders. Loves then entered into an agreement with Evans Distribution Systems to lease approximately a minimum of 100,000 square feet of warehouse space to store mattresses from at its Allen Park storage facility beginning August 12, 2020 for the sum of $27,000 for rent plus logistics cost and labor. This is referred to as "Evans 1". The agreement permitted Loves to flex up to an additional 100,000 square feet as needed, and it ultimately leased approximately 177,000 square feet from Evans 1. Evans used its proprietary warehouse management system ("WMS") which labeled goods, entered them into its inventory system, and tracked the goods.

17. Loves needed additional warehouse space and on August 17, 2020, leased additional 100,000 square feet of space from Evans Distribution Systems at its Lincoln Park facility. ("Evans 2"). Again, these goods were entered into Evans' WMS.

18. As stores were set to open in mid-August, Loves would inform Penske and Evans of the goods needed to be delivered to prepare for store openings. It was Penske's responsibility to find those items in the Burton warehouse, load them and deliver them to stores. Evans was expected to do the same for its two locations. Although Evans had no issues in doing so, Penske

had trouble identifying goods and sent goods to the wrong stores so that one store would get two of everything and another store received no goods. When this happened, Penske's WMS required that the goods be returned to the warehouse, re-entered into the warehouse inventory and then re-issued to the correct store. Loves would be charged for the trip to the incorrect store, the trip back to the warehouse, and then again for the trip to the correct store. Penske often sent out trucks that were less than half loaded which again was charged a flat rate. These warehouse issued delayed store readiness to open and required additional trips to deliver goods thereby increasing fees billed to Loves and delaying a stream of income from the stores. In addition, the Storis information on inventory uploaded from Penske's WMS often reported inaccurate information.

19.  However, the Burton and Evans systems were not integrated, and items were often not where the WMS indicated they could be located. As a result hundreds of deliveries were delayed or ultimately canceled because the merchandise needed to fulfill a customer's order could not be located within the Burton warehouse.

20.  Loves took possession of its permanent warehouse which it leased from LCN on October 1st. Rent was $2,840,136.25 for the first year and was to be paid in quarterly payments of $710,034.06. It spent the first 2 weeks installing required safety lighting needed to obtain a certificate of occupancy, installing wi-fi and telephony systems needed for the WMS and readying the warehouse. Merchandise was then moved in from the two Evans warehouses and from the Burton warehouse. Evans 1 was cleared on November 30, 2020, Evans 2 on November 24, 2020 and the Burton warehouse on December 4, 2020. Because Penske was busy consolidating the warehouses, Evans assisted with the process.

21.  Even after the warehouses were consolidated, Penske continued to have difficulty finding goods to fulfill orders within its warehouse or provide accurate counts. Additionally, it

had yet to set up its WMS to allow for customer pick-ups from the warehouse so it remained necessary to ship items to stores where they could be picked up by customers to avoid a delivery fee. However, Loves was required to pay a substantial fee for each piece delivered from the warehouse to the store for customer pick-up.

## Part V:  Delivered Sales

22.      While initial sales were strong as compared to the projections, sales fell significantly in light of Loves' difficulty locating, obtaining and delivering merchandise to its customers. Many of Loves' suppliers refused to ship further product, much of which had been ordered in May and June, so that items that were expected to be received on which customer deposits had been taken were not longer expected. For some of those items, the unreceived shipments included items that would complete a customer's order without which it was rendered unsaleable. For example, a customer may have ordered a three piece sectional, Loves had received only 2 pieces, and the third piece needed to complete the set might be in the unreceived shipments which the supplier was unwilling to ship due to lack of payment.

23.      The problem of customer cancelations was exacerbated by Loves' decision to close the PA stores, transfer Ann Arbor and Westland to ASI, and then have PFP liquidate another 13 stores in November, 2020. This led many customers to believe that Loves was closing all locations. Customers' uncertainty as to whether Loves would remain in existence, led to numerous cancelations to the point where daily cancelations often exceeded daily sales.

24.      In its 4 months of being open, Loves delivered approximately $40,000,000 in furniture.

## Marketing

25.     Loves believed that getting its name out into the market was crucial for a start-up organization and that a strong Marketing Department was essential for this purpose. Loves hired a Chief Marketing Officer on May 6, 2020, who had significant experience in retail organizations. He began to build a team to work on creative for the stores, the Loves website, social media sites, print, radio, TV and streaming. The team also worked on promotions and marketing events to develop name recognition for Loves. By July, the Marketing team had ten employees and had grown to eighteen employees by the end of October. They also contracted with individuals working on a freelance basis when needed.

26.     In addition to its internal staff, Loves retained Doner as its marketing agency on June 1, 2020 for a contract that ended on December 31, 2020. Doner provided the creative pieces for Loves television, radio and other marketing efforts. Between July and September, 2020, Loves paid Doner a series of payments equaling $233,333.33. In mid-October, sent Doner a notice that it would not renew its agreement and looked to replace them with a less expensive firm. By the time the Agreement with Doner ended Loves had an outstanding balance of $642,917.33 which remains outstanding.

27.     In November, 2020, Loves began negotiations with a smaller local agency to replace Doner. Although an agreement was being negotiated, I have been informed that the replacement agency began work in anticipation of a contractual relationship and incurred fees. In addition, Loves through its Marketing Department, retained Assembly as its media buyer. Assembly purchased more than $6,300,000 in media buys on television, radio and streaming services through mid-December of which approximately $5,000,000 remains outstanding. Other marketing vendors include agencies to create direct mail marketing pieces and a public relations

IBLOOMFIELD\999999999\0400\3050853.v1-1/10/21

firm to help craft messages related to Loves delivery issues and store closures.  Currently, Loves owes more than $10,000,000 to marketing related vendors.

IBLOOMFIELD\999999999\0400\3050853.v1-1/10/21