**IN THE UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LOVES FURNITURE, INC.,[1] | ) Case No. 21-40083 |
| | ) |
| Debtor. | ) Hon. Thomas J. Tucker |
| | ) |

**DEBTOR'S FIRST AMENDED COMBINED PLAN OF**
**LIQUIDATION AND DISCLOSURE STATEMENT**

BUTZEL LONG

Thomas Radom (P24631)
Max Newman (P51483)
41000 Woodward Avenue
Stoneridge West
Bloomfield Hills, MI 48304
Phone: (248) 258-1616
Email:  radom@butzel.com
          newman@butzel.com

COUNSEL TO THE DEBTOR AND
DEBTOR IN POSSESSION

Dated:  May 25, 2021

---

[1] Tax ID Number 85-0548667, located at 6500 E. 14 Mile Rd., Warren, MI  48092.

1

## PRELIMINARY STATEMENT

**UPON ITS FILING, THIS PROPOSED DISCLOSURE STATEMENT WILL BE REVIEWED BY THE BANKRUPTCY COURT ON A PRELIMINARY BASIS TO DETERMINE IF IT CONTAINS ADEQUATE INFORMATION UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE FOR USE IN CONNECTION WITH THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THIS PLAN. UNTIL THE COURT GRANTS PRELIMINARY APPROVAL, THE FILING AND DISSEMINATION OF THIS PLAN AND THE DISCLOSURE STATEMENT ARE NOT INTENDED TO BE AND SHOULD NOT IN ANY WAY BE CONSTRUED AS A SOLICITATION OF VOTES ON THE PLAN. ONCE THE COURT HAS GRANTED PRELIMINARY APPROVAL, PARTIES IN INTEREST MAY RELY ON THE INFORMATION CONTAINED HEREIN IN DETERMINING HOW TO VOTE ON THE PLAN. ANY PRELIMINARY APPROVAL OF THE DISCLOSURE STATEMENT IS SUBJECT TO FINAL OBJECTIONS AS PROVIDED IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT AND ANY ORDERS OF THE BANKRUPTCY COURT.**

## PLAN OF LIQUIDATION

Loves Furniture, Inc., as the debtor and debtor in possession ("Debtor") in this Chapter 11 Case, proposes in good faith this Plan for the resolution of outstanding Creditor Claims and equity Interests (each as defined below).

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE FOLLOWING DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I

## DEFINITIONS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW

**1.1     Scope of Definitions; Rules of Construction**. For the purposes of the Plan, except as expressly provided or unless the context otherwise requires, all capitalized terms not otherwise assigned have the meaning ascribed to them in this Article I of the Plan. Any term used in the Plan that is not defined in the Plan but defined in the Bankruptcy Code or the Bankruptcy Rules, have the meaning ascribed to such terms in the Bankruptcy Code or the Bankruptcy Rules as the case may be. Any definition of a Term in this Plan controls over any definition provided by the Bankruptcy Code or Bankruptcy Rules and any definition provided in the Bankruptcy Code controls over any definition provided in the Bankruptcy Rules.  Whenever the context requires, a term includes the plural as well as the singular and any use of and gendered pronouns include all genders.

**1.2     Definitions**.

**1.2.1     "Administrative Claim"** means any right to payment constituting a cost or expense of administration of the Case under Sections 503(b) and 507(a)(2) of the Bankruptcy Code, including without limitation: (a) any actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the Debtor's business; (b) Claims that have been determined by a Final Order to constitute an administrative expense of the Estate; (c) Administrative Claims of Professionals for Professional Fees; and (d) any fees or charges assessed against and payable by the Debtor under Section 1930 of title 28 of the United States Code.

**1.2.2     "Administrative Claim Bar Date"** means the Voting Deadline and applies to all Administrative Claims other than Administrative Claims for Professional Fees of Professionals, the Liquidation Trustee and any party employed by the Liquidation Trustee.

**1.2.3     "Administrative Creditor"** means any Creditor holding an Allowed Administrative Claim.

**1.2.4     "Affiliate"** has the meaning set forth in section 101(2) of the Bankruptcy Code.

3

**1.2.5** **"Agent"** means a joint venture between PFP and Hilco Merchant Resources, LLC.

**1.2.6** **"Allowed"** means with reference to any Claim: (a) proof of which was Filed by the Proof of Claims Bar Date and as to which neither Debtor, the Liquidation Trustee nor any other party-in-interest has Filed an objection on or before the Claims Objection Bar Date; (b) listed on the Schedules, as amended, as other than disputed, contingent or unliquidated; (c) that has been allowed by a Final Order of the Court (provided, however, that Claims allowed solely for the purpose of voting to accept or reject the Plan will not be considered Allowed Claims hereunder); or (d) expressly allowed under or pursuant to the terms of this Plan.

**1.2.7** **"Avoidance Actions"** means all Claims and Causes of Action that belong to the Debtor or to the Estate under Chapter 5 of the Bankruptcy Code (including, but not limited to, actions under Sections 544-553, et seq.)

**1.2.8** **"Ballot"** means the official bankruptcy Form No. 14 adopted for this Case or a document prepared to substantially conform to same which was distributed to all Creditors and parties-in-interest in connection with the solicitation of votes for or against the Plan.

**1.2.9** **"Balloting Agent"** means Bankruptcy Management Solutions, Inc. d/b/a Stretto ("Stretto").

**1.2.10** **"Bankruptcy Code"** or **"Code"** means the Bankruptcy Reform Act of 1978, as codified in Title 11 of the United States Code (11 U.S.C. §§101, *et seq.*), as in effect as of the Petition Date, or thereafter amended to the extent such amendments are applicable to this Chapter 11 Case.

**1.2.11** **"Bankruptcy Court"** or **"Court"** means the United States Bankruptcy Court for the Eastern District of Michigan, Southern Division, that has jurisdiction over this Chapter 11 Case.

**1.2.12** **"Bankruptcy Rules"** means (a) the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under Section 2075 of title 28 of the United States Code and (b) the local rules of the Court, in each case, as in effect on the Commencement Date or thereafter amended to the extent such amendments are applicable to this Chapter 11 Case.

**1.2.13** **"Beneficiaries"** means Holders of Allowed Claims that are entitled to receive Distributions under the Liquidation Trust.

**1.2.14** **"Business Day"** means any day, other than a Saturday, Sunday or "Legal Holiday," as that term is defined in Bankruptcy Rule 9006(a).

**1.2.15** **"Cash"** means legal tender of the United States.

**1.2.16** **"Causes of Action"** means any and all actions (including Avoidance Actions), proceedings, causes of action, suits, accounts, demands, controversies, agreements, promises,

4

rights to legal remedies, rights to equitable remedies, rights to payment, and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, non-contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, and whether asserted or assertible directly or derivatively in law, equity, or otherwise. Causes of Action also include: (a) any right of setoff, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity belonging to the Estate; (b) any claim pursuant to Sections 362, 502, and 510 of the Bankruptcy Code and any analogous provisions of applicable state law belonging to the Estate; (c) any and all Avoidance Actions (including, but not limited to, any fraudulent conveyance or fraudulent transfer claims the Debtor may have pursuant to Sections 544, 548 and 550 of the Bankruptcy Code or applicable non-bankruptcy law); (d) any claim or defense including fraud, mistake, duress, and usury and any other defenses belonging to the Estate set forth in Section 558 of the Bankruptcy Code; and (f) any claims the Debtor may have against current or former officers, directors, or insiders of the Debtor, other than claims released by this Plan.

**1.2.17** "**Chapter 11 Case**" or "**Case**" means the chapter 11 case of the Debtor pending in the Bankruptcy Court, Case Number 21-40083-tjt, styled "In re Loves Furniture, Inc."

**1.2.18** "**Claim**" means (i) any claim against the Debtor, regardless of whether asserted and regardless of whether known, as the term "claim" is defined in Section 101(5) of the Bankruptcy Code, and includes, but is not limited to: Administrative Expense Claims; Disputed Claims; any claims arising from or related to any Interests and Claims; General Unsecured Claims; Priority Claims; and Secured Claims, and (ii) when used to describe rights to payment that the Debtor may have against any party, "Claim" has the broad scope of the Bankruptcy Code definition, but not the limitation of that section to Claims against the Debtor

**1.2.19** "**Claims Objection Bar Date**" means, as applicable: (a) 180 days after the Effective Date; (b) such other period of limitation fixed by an order of the Court; or upon the stipulation and agreement of the particular Claim Holder and the Liquidation Trustee. The Claims Objection Bar Date applies to any Administrative Claims Filed more than thirty days before the Claims Objection Bar Date.

**1.2.20** "**Class**" means a category of Holders of Claims or Interests as described in Article III of this Plan.

**1.2.21** "**Collateral**" means any property or interest in real or personal property of the Estate subject to an unavoidable Lien securing the payment or performance of a Secured Claim.

**1.2.22** "**Committee**" means the official committee of unsecured creditors that has been appointed pursuant to Section 1102(a) of the Bankruptcy Code in the Chapter 11 Case.

**1.2.23** "**Conditions Precedent**" means those conditions to the Effective Date of the Plan set forth in Section 5.1 of the Plan.

**1.2.24** "**Confirmation Date**" means the date on which the Confirmation Order becomes a Final Order.

5

**1.2.25** "**Confirmation Hearing**" means the hearing to consider the confirmation of the Plan under Section 1128 of the Bankruptcy Code.

**1.2.26** "**Confirmation Order**" means the order entered by the Bankruptcy Court confirming this Plan pursuant to Section 1129 of the Bankruptcy Code.

**1.2.27** "**Consulting Agreement**" means that certain Sale Promotion Consulting Agreement, dated January 12, 2021, between the Debtor and the Agent but subject to the provisions of the Interim and Final Consulting Agreement Orders

**1.2.28** "**Creditor**" means any Holder of a Claim against the Debtor.

**1.2.29** "**Debtor**" means Loves Furniture, Inc. d/b/a Loves Furniture & Mattresses.

**1.2.30** "**Disallowed Claim**" means (a) a Claim, or any portion thereof, that has been disallowed by a Final Order or a settlement, (b) a Claim or any portion thereof that is Scheduled at zero or as contingent, disputed, or unliquidated and as to which a Bar Date has been established but no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law, or (c) a Claim or any portion thereof that is not included in the Schedules and as to which a Bar Date has been established but either: no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law.

**1.2.31** "**Disclosure Statement**" means the Disclosure Statement filed pursuant to Section 1125 of the Bankruptcy Code and the *Order Establishing Deadlines and Procedures*, dated January 27, 2021 [Doc No. 137] with respect to this Plan, and including all exhibits, appendices, and schedules thereto, if any, as same may be amended, modified, or supplemented from time to time, all as approved by the Bankruptcy Court pursuant to sections 1125 and 1127 of the Bankruptcy Code and Bankruptcy Rule 3017.

**1.2.32** "**Disputed**" when used in reference to a Claim or Interest in this Plan means any Claim or Interest as to which Debtor or any other party in interest has interposed an objection or commenced an adversary proceeding in accordance with the Bankruptcy Code, Bankruptcy Rules and this Plan, which objection has not been determined by a Final Order.

**1.2.33** "**Disputed Claim**" or "**Disputed Interest**" means a Claim or any portion thereof, or an Interest or any portion thereof, that is Disputed.

**1.2.34** "**Distribution**" means a distribution of Cash or other property of the Estate made in accordance with the Plan of Liquidation or the Liquidation Trust.

**1.2.35** "**Distribution Date**" means the date on which the Liquidation Trustee must make a Distribution, as determined by the Liquidation Trustee.

**1.2.36** "**Effective Date**" has the meaning set forth in Section 5.2 of the Plan.

6

**1.2.37** "**Entity**" has the meaning defined in Section 101(15) of the Bankruptcy Code.

**1.2.38** "**Estate**" means the Estate of the Debtor in this Chapter 11 Case as created pursuant to Section 541(a) of the Bankruptcy Code.

**1.2.39** "**Exculpated Party**" shall mean the Debtor, the Committee, the Liquidation Trustee, the Liquidation Trust Oversight Committee or any of their respective equity holders (regardless of whether such interests are held directly or indirectly), independent contractors, members, officers, directors, managers, employees, consultants, advisors, agents, successors, assigns or Professionals, each in their capacity as such.

**1.2.40** "**Executory Contract**" means a contract to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

**1.2.41** "**Exhibit**" means any document identified as an "exhibit" in this Plan, as modified, amended, or supplemented.

**1.2.42** "**February 5 Order**" means the *Order (I) Granting Debtor's Motion for Entry of Order Authorizing (A) Use of Cash Collateral Pursuant to 11 U.S.C. §363, (B) Permitting Use of Inventory Potentially Subject to Security Interests and Liens and Preventing Interference with Such Use, and (C) Granting of Superpriority Claims and Adequate Protection on a Final Basis, and (II) Scheduling Further Hearing as to Penske Logistics, LLC, including a Final Hearing* dated February 5, 2021[Doc No. 189].

**1.2.43** "**File**" or "**Filed**" means, with respect to any pleading, entered on the docket of the Case and properly served in accordance with the Bankruptcy Rules.

**1.2.44** "**Final Cash Collateral Order**" means that certain *Final Order Granting Debtor's Emergency Motion for Entry of Order Authorizing (A) Use of Cash Collateral Pursuant to 11 U.S.C. §363, (B) Permitting Use of Inventory Potentially Subject to Security Interests and Liens and Preventing Interference with Such Use, and (C) Granting Superpriority Claims and Adequate Protection on a Final Basis,* dated February 18, 2021 [Doc No. 234], which incorporates by reference the February 5 Order.

**1.2.45** "**Final Decree**" means the decree closing the Case contemplated under Bankruptcy Rule 3022.

**1.2.46** "**Final Order**" means an order of the Bankruptcy Court as to which (a) the time for appeal has expired and no appeal has been timely taken, (b) any timely appeal has been finally determined or dismissed and the time for any successive appeal has expired and no successive appeal has been timely taken, or (c) in the discretion of the Liquidation Trust, an appeal has been timely taken but such order has not been stayed within ten (10) days after the filing of such appeal.

**1.2.47** "**General Unsecured Claim**" means an Allowed unsecured Claim that is not a Priority Claim, including Allowed rejection damage Claims asserted under the provisions of this Plan.

7

**1.2.48** **"General Unsecured Creditor"** means any Creditor that holds a General Unsecured Claim.

**1.2.49** **"Holder"** means a Person holding a Claim, Interest, or Lien, as applicable.

**1.2.50** **"Impaired"** means, when used with reference to a Claim or Interest that is impaired within the meaning of Section 1124 of the Bankruptcy Code.

**1.2.51** **"Intercompany Claim"** means any Claim against the Debtor by an Affiliate of the Debtor arising before the Petition Date.

**1.2.52** **"Interest"** means any equity interests in the Debtor, of any kind or nature, including without limitation, any corporate share interests.

**1.2.53** **"LCN"** means LCN AVF Warren (MI) LLC, LCN AVF Dearborn (MI) LLC and all of their affiliates.

**1.2.54** **"Lien"** means a charge against, or an interest in, property to secure payment of a debt or performance of an obligation, including a replacement lien created under the Final Cash Collateral Order.

**1.2.55** **"Liquidation Trust"** means that Liquidation Trust established pursuant to the Plan of Liquidation in which the Liquidation Trust Assets vest as set forth in the Plan on the Effective Date.

**1.2.56** **"Liquidation Trust Agreement"** means that Liquidation Trust Agreement that governs the operation and management of the Liquidation Trust, in a form substantially similar to Exhibit A hereto.

**1.2.57** **"Liquidation Trust Assets"** means all of the assets transferred or granted to the Liquidation Trust, consisting of: (i) the Causes of Action and Estate Litigation; (ii) the Liquidation Trust Proceeds; and (iii) all other Assets of the Estate.

**1.2.58** **"Liquidation Trustee"** means the Person on identified in the Plan Supplement which must be filed at least 10 days before the Confirmation Date, including any replacement thereof or successor thereto, who has been designated by the Debtor and the Committee to serve as trustee for the Liquidation Trust and to oversee the liquidation of the Liquidation Trust Assets for the benefit of Beneficiaries in accordance with the Plan and the Liquidation Trust Agreement.

**1.2.59** **"Liquidation Trust Claims"** means any expenses incurred by the Liquidation Trust, including the professional fees and expenses incurred by any Entity retained by the Liquidation Trustee.

**1.2.60** **"Liquidation Trust Oversight Committee"** means a committee that will be selected by and from the Committee which will have the approval rights set forth in the Liquidation Trust Agreement or the Plan.

**1.2.61  "Liquidation Trust Proceeds"** means the proceeds from the collection, liquidation, sale or other disposition of the Debtor's Assets as of the Effective Date, including the proceeds received from any Causes of Action or Estate Litigation.

**1.2.62**  "**Person**" has the meaning defined in Section 101(41) of the Bankruptcy Code.

**1.2.63**  "**Petition Date**" means January 6, 2021, the date upon which the Debtor voluntarily filed for relief pursuant to chapter 11 of the Bankruptcy Code.

**1.2.64**  "**PFP**" means Planned Furniture Promotions, Inc.

**1.2.65**  "**Plan**" means this Combined Joint Plan of Liquidation and Disclosure Statement, as it may be altered, amended, supplemented or modified from time to time.

**1.2.66  "Plan Supplement"** means any supplement to the Plan Filed by the Debtor with the Court prior to the Effective Date.

**1.2.67**  "**Priority Claim**" means a Claim under or entitled to priority under any of the following sections of the Bankruptcy Code: Sections 507(a)(1), 507(a)(3), 507(a)(4), 507(a)(5), 507(a)(6), 507(a)(7) and 507(a)(8) of the Bankruptcy Code.

**1.2.68**  "**Priority Creditor**" means any Creditor holding a Priority Claim.

**1.2.69**  "**Professional**" means any professional employed in the Chapter 11 Case pursuant to Sections 327 or 1103 of the Bankruptcy Code.

**1.2.70**  "**Professional Fees**" means the fees and reimbursement for disbursements and expenses owed to Professionals in connection with the Chapter 11 Case. Notwithstanding anything to the contrary, the deadline to file Claims for Professional Fees is thirty (30) days after the Confirmation Date.

**1.2.71**  "**Professional Fee Escrow Accounts**" means the separate escrow accounts required by the Final Cash Collateral Order and earmarked in the Budget or post-Budget towards payment of Professional Fees for the Debtor's and the Committee's Professionals.

**1.2.72**  "**Proof of Claim or Interest**" means a Claim or Interest properly filed by a Holder of a Claim or Interest before the Proof of Claim Bar Date.

**1.2.73**  "**Proof of Claim Bar Date(s**)" means May 10, 2021 in the case of general unsecured creditors, and August 9, 2021 in the case of governmental units, which are the dates designated by the Bankruptcy Court, at Docket Number 64, as the last date(s) for filing Proofs of Claim or Interest against the Debtor, and any and all other bar dates under the Bankruptcy Rules or otherwise provided for in this Plan.

**1.2.74**  "**Pro-Rata**" means at any time, the proportion that the face amount of a Claim in a particular Class bears to the aggregate face amount of all Claims (including Disputed Claims) in such Class unless the Plan expressly provides otherwise.

**1.2.75 "Record Date"** means the record date for determining the entitlement to receive Distributions under the Plan on account of Allowed Claims.

**1.2.76 "Representatives"** means, without limitation, any existing or former affiliate, subsidiary, member, officer, director, partner, stockholder, trustee, member, representative, employee, agent, attorney, business advisor, financial advisor, accountant, other Professional, their successors or assigns, or any person who is or was in control of any of the foregoing.

**1.2.77** "**Schedules**" means the schedules of assets and liabilities, the list of Holders of Interests and the statement of financial affairs filed by the Debtor under Section 521 of the Bankruptcy Code and Bankruptcy Rule 1007 as such schedules and statements have been, or may be supplemented or amended through the Confirmation Date.

**1.2.78** "**Secured Claim**" means a Claim secured by a Lien on property in which the Estate has an interest, but only to the extent of the value of the Creditor's interest in the Estate's interest in the property as of the Petition Date and only if such Secured Claim is Allowed.

**1.2.79** "**Shift 4**" means Shift4 Payments, LLC.

**1.2.80** "**STORES**" means, collectively, Store Capital Acquisitions, LLC, STORE SPE AVF I 2017-1, LLC, STORE SPE AVF II 2017-2, LLC and STORE Master Funding XII, LLC.

**1.2.81** "**Store Closing Order**" means that *Final Order (I) Authorizing The Debtor to (A) Assume Prepetition Consulting Agreements; (B) Enter to the Consulting Agreement, (II) Authorizing and Approving the Conduct of Store Closing Sales, with such Sales to be Free and Clear of all Liens, Claims, and Encumbrances, (III) Authorizing and Approving the Store Closing Procedures, and (IV) Granting Related Relief,* dated February 5, 2021[Doc No. 191].

**1.2.82** "**STORES Locations**" means the locations leased by the Debtor from STORES as of the Petition Date, and includes the following locations: Royal Oak, Warren South, Taylor, Shelby Township, Howell, Portage, Waterford, Woodbridge, Port Huron, Livonia, Burton, Saginaw, Bay City, and Petoskey.

**1.2.83 "Unclaimed Property"** means any Distributions that are returned to the Liquidation Trustee or Liquidation Trust as: (i) undeliverable to a Beneficiary, or (ii) unclaimed by a Beneficiary, as further described in Section 8.5.1 hereto.

**1.2.84 "Unimpaired"** means an Allowed Claim or Equity Interest that is not "Impaired" within the meaning of Section 1124 of the Bankruptcy Code.

**1.2.85 "United States Trustee"** means the United States Trustee appointed under Section 591 of title 28 of the United States Code to serve in the Eastern District of Michigan.

**1.2.86 "Voting Deadline"** means the date and time by which all Ballots must be received, or such other date and time established by the Court.

**1.3    Rules of Interpretation**

For purposes of the Plan: (a) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the document will be substantially in that form or substantially on those terms and conditions; (b) any reference in the Plan to an existing document or exhibit Filed or to be Filed means the document or exhibit as it may have been or may be amended, modified, or supplemented; and (c) unless otherwise specified, all references in the Plan to Articles, Schedules, and Exhibits are references to articles, schedules, and exhibits of or to the Plan. Unless otherwise specified, the words "herein," "hereof," "hereto," "hereunder," and other words of similar meaning refer to the Plan as a whole and not to any particular article, section, subsection, or clause contained in the Plan. Except as otherwise stated in the Plan, the rules of construction contained in Section 102 of the Bankruptcy Code apply to the construction of the Plan.

**1.4    Computation of Time**.

Unless otherwise expressly provided herein, in computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) apply. If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but will be deemed to have been completed as of the required date.

**1.5    Governing Law.**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Michigan, without giving effect to principles of conflict of laws, shall govern the rights, obligations, construction and implementation of the Plan, any agreements, documents, instruments or contracts executed or entered into in connection with the Plan.

**ARTICLE II**

**ADMINISTRATIVE EXPENSE CLAIMS AND NON-VOTING PRIORITY CLAIMS**

**2.1    Administrative Claims**

**2.1.1**    All Allowed Administrative Claims of the Debtor, including Allowed post-petition Claims under Section 503(b) of the Bankruptcy Code, and Allowed prepetition Claims under Section 503(b)(9) of the Bankruptcy Code, must be paid in cash, in full, on the later of (i) thirty (30) days after entry of a Final Order of the Bankruptcy Court Allowing such Administrative Claim, or (ii) if the Administrative Claim is not Disputed by the Debtor or the Liquidation Trustee, as the case may be, and is an Allowed Claim, the later of its due date or thirty (30) days after the Effective Date.

**2.1.2** All statutory fees of the Debtor payable to the United States Trustee pursuant to Section 1930 of title 28 of the United States Code must be paid (i) if due and owing, on or prior to the Effective Date by the Debtor, and (ii) if due and owing after the Effective Date, as and when due from the proceeds of the Liquidation Trust.

**2.1.3** Professionals of the Estate have an Allowed Administrative Claim for all fees and expenses incurred through and including the Effective Date, or that come due after the Effective Date, to the extent such Claims are ultimately approved by the Court. In the case of Administrative Claims of all Professionals, Professionals must file final fee applications for services provided to or for the benefit of the Debtor and/or the Committee within thirty (30) days after the Effective Date. All Allowed Administrative Claims of Professionals must be paid by the Liquidation Trustee in Cash first from the Professional Fee Escrow Accounts and, if the Professional Fee Escrow Account is not sufficient, then from the Liquidation Trust Assets within ten (10) days after the entry of a Final Order approving the Administrative Claims of such Professionals.

**2.1.4** All such Allowed Administrative Claims of Professionals must be paid prior to the payment of any post-confirmation Liquidation Trust Expenses, including Professional Fees of the Liquidation Trust and/or Liquidation Trustee.

**2.2    Priority Tax Claims**. These Claims include all Allowed Claims against the Debtor that are entitled to priority under Section 507(a)(8) of the Bankruptcy Code. Each holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date, shall receive, on account of such Allowed Claim, on or as soon as reasonably practicable after the Effective Date and after payment in full of all Allowed Claims and Liquidation Trust Claims entitled to higher priority in payment in accordance with Section 507 of the Bankruptcy Code or the terms of this Plan: (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; or (2) Cash in an amount agreed to by the Debtor or the Liquidation Trustee, as applicable, and such claimant. Allowed Priority Tax Claims shall, to the extent not paid in full in Cash on the Effective Date, be paid from the Liquidation Trust Assets in accordance with the terms of the Liquidation Trust Agreement and the holders of Allowed Priority Tax Claims shall be beneficiaries of the Liquidation Trust.

**ARTICLE III**

**<u>CLASSIFICATION OF CLAIMS AND INTERESTS</u>**

**3.1** Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of classes of Claims against and Interests in the Debtor. A Claim or Interest is placed in a particular Class for the purposes of voting on this Plan and or receiving Distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Customer Deposit Claims and Priority Tax Claims of the kinds specified in sections 507(a)(1)and 507(a)(8) of the Bankruptcy Code, respectively, have not been classified and their treatment is set forth in Article 2 above.

12

**3.2** The classification of Claims against and Interests in the Debtor pursuant to the Plan are as follows:

| Class | Claim | Amount[2] | Status | Vote |
|---|---|---|---|---|
| 1 | Priority Claims for Customer Deposits | $541,590 | Unimpaired | Not Entitled to Vote |
| 2 | Secured Claims of STORES | $2,600,000 | Impaired | Entitled to Vote |
| 3 | Secured Claim of PFP | $2,225,000 | Unimpaired | No entitlement to vote, deemed to accept |
| 4 | Secured Claim of Westwood Capital Funding, LLC | $603,470 | Unimpaired | No entitlement to vote, deemed to accept |
| 5 | Secured Claim of Penske Logistics, LLC | $1,608,893 | Impaired | Entitled to Vote |
| 6 | Secured Claim of TD Bank | $1,469,028 | Impaired | Entitled to Vote |
| 7 | Secured Claim of Shift 4 | $241,992.92 | Impaired | Entitled to Vote |
| 8A | Secured Claim of A&R Properties | $72,443 | Unimpaired | No entitlement to vote, deemed to accept |
| 8B | Secured Claim of Argyle Acres | $23,628 | Unimpaired | No entitlement to vote, deemed to accept |
| 9 | General Unsecured Claims | $53,500,000 (est) | Impaired | Entitled to Vote |
| 10 | Tax Penalty Claims | $516,072 | Impaired | Entitled to Vote |
| 11 | Equity Interest | | Impaired | Entitled to Vote |

## ARTICLE IV

## TREATMENT OF CLASSES AND INERESTS UNDER THE PLAN

### 4.1 Class 1 – Priority Claims of Customers for Return of Deposits

These Claims include all Allowed Claims against the Debtor that are entitled to priority under Section 507(a)(7) of the Bankruptcy Code. Each Holder of an Allowed Priority Customer Deposit Claim will receive on or as soon as reasonably practicable after the Effective Date and after payment in full of all Allowed Claims and Liquidation Trust Claims entitled to higher priority in payment in accordance with Section 507 of the Bankruptcy Code or the terms of this Plan, Cash in an amount equal to the amount of such Allowed Priority Customer Deposit Claim. Allowed Priority Customer Deposit Claims, to the extent they have not been paid in full in Cash on the Effective Date, must be paid by the Liquidation Trustee and the

---

[2] Each claim is measured as of the Petition Date.

Holders of Allowed Priority Customer Deposit Claims are Beneficiaries of the Liquidation Trust.

Class 1 Claims are Unimpaired and are not entitled to vote to accept or reject the Plan.

### 4.2    Class 2 - Secured Claims of STORES

Class 2 Claim consists of the Allowed Secured Claims of STORES.  The Allowed Secured Claim of STORES equals the value of the Debtor's inventory at the STORES Locations as of the Petition Date, less all amounts paid to STORES as adequate protection during the Case.  Upon allowance of the Secured STORES Claims by a Final Order of the Court or upon the agreement of either (a) the Committee, in consultation with the Debtor, or (b) the Liquidation Trustee, as the case may be, and STORES, STORES will receive, on account of such Allowed Secured Claims,  a payment in Cash within 30 days of the Effective Date equal to the balance of the STORES Allowed Secured Claim after credit for all adequate protection payments.  To the extent the Allowed Claims of STORES exceeds the value of the Secured STORES Claim, the difference is a Class 9 General Unsecured Claim.

The Allowed Secured STORES Claim is Impaired and STORES is entitled to vote to accept or reject the Plan.

### 4.3    Class 3 - Secured Claim of PFP

Class 3 Claim consists of the Allowed Secured Claim of PFP.  The Debtor anticipates that the Allowed PFP Secured Claim will be paid in full from inventory sale proceeds in accordance with the Store Closing Order and the terms of the Consulting Agreement on or before the Effective Date of the Plan.  The provisions of the Final Cash Collateral Order providing for the payment of the Prepetition Advance (as that term is used in the Final Cash Collateral Order) by PFP to the Debtor are incorporated in this Plan.

The Allowed PFP Secured Claim is Unimpaired and PFP is deemed to accept the Plan.

### 4.4    Class 4 - Secured Claim of Westwood Capital Funding, LLC

Class 4 consists of the Allowed Secured Claim of Westwood Capital Funding, LLC ("Westwood").  This claim is being paid in weekly installments of $51,060 by the Debtor pursuant to the Budget approved by the Court under the February 5 Order.  Westwood is entitled to post-petition interest under 11 U.S.C. §506.  The total amount that will be paid to Westwood is $633,000.  The Debtor anticipates that the Allowed Secured Westwood Claim will be paid in full on or prior to the Effective Date of the Plan.

The Allowed Secured Westwood Claim is Unimpaired and Westwood is deemed to accept the Plan.

**4.5     Class 5 – Secured Claim of Penske Logistics, LLC**

Class 5 consists of the Allowed Secured Claim of Penske Logistics, LLC.  This claim is Disputed.  Upon allowance of the Secured Penske Claim by a Final Order of the Court or upon the agreement of either (a) the Committee, in consultation with the Debtor, or (b) the Liquidation Trustee, as the case may be, and Penske, Penske must receive, on account of such Allowed Secured Claim, Cash in the amount of the Allowed Secured Claim payable from the Penske Collateral Account established under the Final Cash Collateral Order in full and complete settlement of the Secured Penske Claim. All monies in the Penske Collateral Account constituting the collateral subject to the replacement Lien of Penske will remain in a post-confirmation collateral account subject to the replacement Lien with the Liquidation Trustee pending a determination of the Secured Penske Claim or the further order of the Court. If the Secured Penske Claim is determined to be invalid, the monies in the Penske collateral account will become property of the bankruptcy estate or the Liquidation Trust, free and clear of any claim or interest of Penske. In no event will the Secured Penske Claim, if determined to be valid, exceed the then account balance in the post-confirmation Penske collateral account. To the extent that the Secured Penske Claim is determined to be undersecured in accordance with section 506(a) of the Bankruptcy Code, the unsecured amount of the such Claim is a Class 9 General Unsecured Claim.  Notwithstanding anything to the contrary as may be contained herein, any and all rights of the Debtor or the Liquidation Trustee to set off against the Allowed Penske Secured Claim any judgment for damages it may be awarded based on breach of contract and/or other Claims described in section III(B) of the Disclosure Statement are expressly reserved.

The Secured Penske Claim is Impaired and Penske is entitled to vote to accept or reject the Plan.

**4.6     Class 6 – Secured Claim of TD Bank**

Class 6 consists of the Allowed Secured Claim of TD Bank. This claim is Disputed. Upon allowance of the Secured TD Bank Claim by a Final Order of the Court or upon the agreement of the Committee, in consultation with the Debtor, or the Liquidation Trustee, as the case may be, and TD Bank, TD Bank is entitled to set off its Allowed Secured Claim against the Reserve Fund established by, and in the possession and control of, TD Bank. All monies in the Reserve Fund are property of the Estate, subject to the setoff/recoupment rights of TD Bank and must remain in the Reserve Fund pending a determination of the Allowed Secured TD Bank Claim. In no event will the Allowed Secured TD Bank Claim exceed the account balance in the Reserve Account. To the extent that Allowed Secured TD Bank Claim is determined to be undersecured in accordance with section 506(a) of the Bankruptcy Code, the unsecured amount of the such Claim is a Class 9 General Unsecured Claim.

The Secured Claim of TD Bank is Impaired and TD Bank is entitled to vote to accept or reject the Plan.

**4.7     Class 7 – Secured Claim of Shift 4**

Class 7 consists of the Allowed Secured Claim of Shift 4.  Shift 4 served as the Debtor's prepetition merchant credit card processor and asserts a secured claim against the Debtor in the amount of $241,992.92 (the "Shift 4 Reserve Account") as a right to setoff or recoup against its Allowed Claim against $241,992.92 that it is holding from amounts otherwise due to the Debtor.  The Debtor believes that the Allowed Claim of Shift 4 will exceed the Shift 4 Reserve Account.  Unless prior to the Effective Date, the Court has entered a Final Order authorizing Shift 4 to setoff or recoup against the Shift 4 Reserve its Allowed Secured Claim, after the Effective Date, the Liquidation Trustee  will have 30 days to file an objection to Shift 4's right to set off or recoup its Allowed Secured Claim against the Shift 4 Reserve Account.  If no objection is filed, Shift 4's Allowed Secured Claim shall automatically be determined to be $241,992 and Shift 4 will have the right to immediately set off or recoup its Allowed Secured Claim against the Shift 4 Reserve Account without regard to any other provision of this Plan, the  Liquidation Trust or the Code and without the further order of the Court. Monies constituting the Shift 4 Reserve Account are property of the Estate, subject to Shift 4's right of setoff or recoupment and must remain in the Shift 4 Reserve Account pending a determination of the Allowed Shift 4 Secured Claim. In no event will the Allowed Secured Shift 4 Claim exceed the balance of the Shift 4 Reserve Account. If an objection is timely filed, the Court shall determine the amount of Shift 4's Allowed Secured Claim and the appropriateness of any right of setoff or recoupment.

To the extent that the Allowed Shift 4 Claim is determined to be undersecured in accordance with section 506(a) of the Bankruptcy Code, the unsecured amount of such Claim is a Class 9 General Unsecured Claim.

**4.8     Class 8A –Secured Claim of A&R Properties**

Class 8A consists of the Allowed Secured Claim of A&R Properties .  Under 11 U.S.C. §1129(b)(2)(A)(iii), the Debtor must surrender the collateral consisting of various equipment and store fixtures that secures A&R Properties' Allowed Secured Claim to A&R Properties, on or prior to the Effective Date in full settlement and satisfaction of this Claim against the Debtor and the Estate.

The Class 8A Secured Claim is Unimpaired and A&R Properties is deemed to accept the Plan.

**4.9     Class 8B – Secured Claim of Argyle Acres**

Class 8B consists of the Allowed Secured Claim of Argyle Acres.  Under 11 U.S.C. §1129(b)(2)(A)(iii), the Debtor must surrender the collateral consisting of various equipment and store fixtures that secures Argyle Acres' Allowed Secured Claim to Argyle Acres on or prior to the Effective Date in full settlement and satisfaction of this Claim against the Debtor and the Estate.

The Class 8B Secured Claim is Unimpaired and Argyle Acres is deemed to accept the Plan.

16

**4.10    Class 9 – General Unsecured Claims**

Class 9 consists of all Allowed General Unsecured Claims against the Debtor, including, without limitation, (i) each Allowed Claim arising out of the rejection of any executory contract or unexpired lease pursuant to sections 365 and 502(g)(1) of the Bankruptcy Code; (ii) each Allowed Claim secured by a lien on property in which the estate has an interest to the extent that such claim is determined to be unsecured in accordance with section 506(a) of the Bankruptcy Code; and (iii) each Allowed Claim of the kinds described in section 507(a)(4) of the Bankruptcy Code, to the extent the Allowed amount of such Claim exceeds the maximum amount for which such Claim may be accorded priority thereunder. Holders of Allowed Class 9 Claims will receive, on account of each respective Allowed General Unsecured Claims, their Pro Rata share of the Unsecured Creditors Escrow established pursuant to paragraph 18 of the February 5 Order, net of any portion that may, at the election of the Committee, be allocated to a Litigation Trust, plus their Pro Rata share of the Liquidation Trust Assets, after the satisfaction of Administrative Expense Claims, Post Confirmation Trust Claims, Priority Claims, and Classes 1-7 Claims.

Class 9 claims are Impaired and each Holder of an Allowed General Unsecured Claim as of the Record Date is entitled to vote to accept or reject the Plan.

**4.11    Class 10 – Tax Penalty Claims**

Class 10 consists of the Allowed Tax Penalty Claims of the applicable state taxing agencies. The penalties were assessed against the Debtor for failure to timely pay sales taxes prior to the Petition Date.  Pursuant to Section 726(a)(4) of the Bankruptcy Code, the Holders of Class 8 Claims must receive, on account of their respective claims, their Pro Rata share of the Liquidation Trust Assets, after the satisfaction of Administrative Expense Claims, Post Confirmation Trust Claims, Prepetition Priority Claims, and Classes 1-7 and 9 Claims.

Class 10 claims are Impaired and each Holder of an Allowed Tax Penalty Claim as of the Record Date is entitled to vote to accept or reject this Plan.

**4.12    Class 11 – Equity Interests**

Class 11 consists of the Equity Interest in the Debtor held by US Assets, Inc. The Holder of Class 11 Equity Interest will not receive any distribution on account of such interest except to the extent funds remain after payment in full of all Administrative Expense Claims, Post Confirmation Trust Claims, Prepetition Priority Claims and Classes 1-7, 9 and 10 Claims. On the Effective Date, Class 9 Equity Interest are cancelled, extinguished, and of no further force and effect, without the payment of any monies or consideration to the Holder of Class 11 Equity Interest.

Class 11 is Impaired and the Holder of the Class 9 Equity Interest is deemed to reject the Plan.

# ARTICLE V

## MEANS OF IMPLEMENTATION OF THE PLAN

**5.1    Conditions Precedent to the Effective Date**

The following are conditions precedent to the Effective Date that must be satisfied or waived by the Debtor:

a.    Entry of the Confirmation Order and the Confirmation Order having become a Final Order.

b.    All Store Closing Sales and Store Closings must have been completed in all respects by the Agent.

c.    The Liquidation Trust Agreement must have been executed and the Liquidation Trust must have been established.

d.    The Liquidation Trustee and the Liquidation Trust Oversight Committee have been created and authorized to assume the rights and responsibilities provided in the Plan and the Liquidation Trust Agreement.

**5.2    Effective Date.** The Effective Date occurs on the first Business Day after all of the conditions of Section 5.1 have been met.

**5.3    Substantial Consummation**.  Substantial Consummation of the Plan, as defined in 11 U.S.C. §§ 1101 and 1127, shall be deemed to occur on the Effective Date.

**5.4    Liquidation Trust**. The Liquidation Trust must be established on the Effective Date for the benefit of all Beneficiaries and is governed by the Liquidation Trust Agreement. The Liquidation Trustee administers the Liquidation Trust Assets pursuant to the Plan and the Liquidation Trust Agreement from and after the Effective Date and will have the powers set forth in the Liquidation Trust Agreement, which powers, subject to the rights of the Liquidation Trust Oversight Committee, including, the power to employ professionals, the right to distribute, operate, sell, use, lease, abandon or otherwise dispose of the Liquidation Trust Assets, the right to object to or continue objections to Claims, and the right to pursue Causes of Action, as well as all rights set forth in the Liquidation Trust Agreement. Unless specifically stated otherwise herein, the Liquidation Trustee will not be required to obtain Bankruptcy Court approval with respect to any proposed action or inaction authorized in this Liquidation Trust Agreement or specifically contemplated in this Plan and the Confirmation Order and unless otherwise set forth in this Plan or in the Liquidation Trust Agreement, the Liquidation Trustee is not required to submit a proposed settlement to the Bankruptcy Court or such other court of competent jurisdiction on any matter for approval.

**5.5    Vesting of Assets**. On the Effective Date of the Plan, all Liquidation Trust Assets will automatically be transferred to and vest in the Liquidation Trust without further action by any party and will be deemed contributed thereto, subject to the terms of the Plan and the

18

Liquidation Trust Agreement. With respect to any Cause of Action, including any pending adversary proceedings wherein the Debtor is a plaintiff, the Liquidation Trust is automatically a successor to the Debtor in such action and is substituted for the Debtor in all respects.

Nothing in this Plan or the Liquidation Trust precludes payment of: (a) any statutory fees under 28 U.S.C. § 1930 due and owing to the extent unpaid on the Effective Date or arising after the Effective Date; and (b) the Liquidation Trust Expenses in accordance with the Plan and the Liquidation Trust Agreement.

**5.6      Preservation of Causes of Actions**.

**5.6.1**   The Liquidation Trustee will be assigned all rights of the Debtor to commence and pursue any and all Causes of Action (under any theory of law, including, without limitation, the Bankruptcy Code, and in any court or other tribunal including, without limitation, in an adversary proceeding filed in the Debtors' Chapter 11 Case) to the extent the Liquidation Trustee deems appropriate, other than any Causes of Action that have been previously released or are being released in conjunction with this Plan.

**5.6.2**   All Causes of Action not expressly and specifically released in connection with the Plan, the Confirmation Order, or in any settlement agreement approved by a Final Order during the Chapter 11 Case, or as otherwise provided in the Confirmation Order or in any contract, instrument, release, indenture or other agreement entered into in connection with the Plan, in accordance with Section 1123(b) of the Bankruptcy Code remain assets of and vest with the Liquidation Trust, whether or not litigation relating thereto is pending on the Effective Date, and whether or not any such Causes of Action have been listed or referred to in the Plan, the Schedules, or any other document filed with the Bankruptcy Court, and neither the Debtor nor the Liquidation Trustee waive, relinquish, or abandon (nor are they be estopped or otherwise precluded from asserting) any Cause of Action that constitutes property of the Estates: (a) whether or not such Cause of Action has been listed or referred to in the Plan or the Schedules, or any other document filed with the Bankruptcy Court, (b) whether or not such Cause of Action is currently known to the Debtor, and (c) whether or not a defendant in any litigation relating to such Cause of Action filed a Proof of Claim in the Chapter 11 Case, filed a notice of appearance or any other pleading or notice in the Chapter 11 Case, voted for or against the Plan, or received or retained any consideration under the Plan. Without in any manner limiting the generality of the foregoing preservation of rights, notwithstanding any otherwise applicable principal of law or equity, without limitation, any principals of judicial estoppel, res judicata, collateral estoppel, issue preclusion, or any similar doctrine, the failure to list, disclose, describe, identify, or refer to a Cause of Action in the Plan, the Schedules, or any other document filed with the Bankruptcy Court in no manner waive, eliminate, modify, release, or alter the Liquidation Trustee's right to commence, prosecute, defend against, settle, and realize upon any Causes of Action that the Debtor or the Liquidation Trustee has, or may have, as of the Effective Date. It is the express intention of this Plan that Causes of Action be preserved to the maximum extent permitted by law. The Liquidation Trustee may commence, prosecute, defend against, settle, and realize upon any Causes of Action in their sole discretion, in accordance with what is in the best interests, and for the benefit, of the Liquidation Trustee.

**5.7     Reservation of Rights**. With respect to any Chapter 5 Claim that the Liquidation Trustee may abandon in accordance with Section 5.6.2 of the Plan, the Liquidation Trustee reserves all rights, including the right under section 502(d) of the Bankruptcy Code to use defensively the abandoned Chapter 5 Claim as a basis to object to all or any part of a Claim against the Estate asserted by a creditor which remains in possession of, or otherwise obtains the benefit of, the avoidable transfer.

**5.8     The Liquidation Trust Oversight Committee**.

     **5.8.1     Appointment**. On the Effective Date, the Liquidation Trust Oversight Committee designated in the Plan Supplement will be formed pursuant to the Liquidation Trust Agreement. The Liquidation Trust Oversight Committee will be comprised, initially, of three (3) members selected by the Committee. The initial members of the Liquidation Trust Oversight Committee will be identified in the Plan Supplement.

     **5.8.2     Authority**. The Liquidation Trust Oversight Committee will monitor, review and advise the Liquidation Trustee with respect to its actions in administering the Liquidation Trust in furtherance of the purposes set forth in the applicable provisions of the Liquidation Trust and the Plan. The Liquidation Trust Oversight Committee also will have the authority to remove the Liquidation Trustee for cause only or to accept the resignation of the Liquidation Trustee and to appoint a successor Liquidation Trustee.

**5.9     Nonconsensual Confirmation**

     If any impaired Class of Claims or Equity Interests entitled to vote does not accept the Plan by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Debtor reserves the right to amend the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both. With respect to any impaired classes of Claims that are deemed to reject the Plan, the Debtor will request the Bankruptcy Court to confirm the Plan under section 1129(b) of the Bankruptcy Code.

**5.10     Closing of Chapter 11 Case**

     When each Disputed Claim filed against the Debtor has become an Allowed Claim or a disallowed Claim, and all Causes of Action have been resolved, and all Cash has been distributed in accordance with the terms of the Plan and the Liquidation Trust Agreement, the Liquidation Trustee must seek authority from the Bankruptcy Court to close the Case in accordance with the Bankruptcy Code and the Bankruptcy Rules and to request the Bankruptcy Court to enter the Final Decree.  Nothing contained herein prevents any other party from seeking the entry of a Final Decree or the Court from entering the Final Decree. Notwithstanding anything in Section 546(a)(2) of the Code, the entry of the Final Decree will not cause the Statute of Limitations on Avoidance Actions to expire.

**5.11     Dissolution of Committee**

     **5.11.1**   The Committee will continue in existence until the Effective Date, and until the Effective Date will exercise those powers and perform those duties specified in section 1103 of

the Bankruptcy Code, and perform such other duties as it may have been assigned by the Bankruptcy Court prior to the Effective Date.

**5.11.2**  On the Effective Date, the Committee will be dissolved and its members will be released of all of their duties, responsibilities and obligations in connection with the Bankruptcy Cases or the Plan and its implementation, and the retention or employment of the Committee's attorneys, financial advisors, and other agents will terminate, except to the extent necessary to prosecute final fee applications.

**5.11.3**  Notwithstanding anything in this Article 6, the Committee will have standing and the right to be heard following dissolution of the Committee solely with respect to: (a) Administrative Claims for Professional Fees of Professionals arising prior to the Effective Date; and (b) any appeals of the Confirmation Order. All reasonable fees and expenses incurred therein must be paid by the Liquidation Trustee to the extent of available assets, as applicable, without further order of the Bankruptcy Court.

**5.12**   **Dissolution of the Debtor and Resignation of Officers and Directors**

From and after the contribution of the Debtor's assets to the Liquidation Trust on the Effective Date, the Debtor will be dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtor or payments to be made in connection therewith; provided, however, that the Liquidation Trustee on behalf of the Debtor may file with the appropriate governmental authority or authorities a certificate or statement of dissolution referencing the Plan and any and all required tax returns or other documents required by this Plan or applicable law. From and after the Effective Date, the Debtor will not be required to file any document, or take any other action, to withdraw its business operations from any states in which the Debtor was previously conducting business. Upon the Effective Date, all of the Debtor's officers and directors will be terminated by the Debtor without the necessity of any further action or writing, and  released from any responsibilities, duties and obligations that arise after the Effective Date to the Debtor or its creditors under the Plan, the Liquidation Trust Agreement, or applicable law. Unless hired by the Liquidation Trustee for a specific purpose such parties will not be entitled to any compensation from the Debtor or the Liquidation Trustee for services provided after the Effective Date.

**ARTICLE VI**

**DISTRIBUTIONS**

**6.1**   **Payment Up to Allowed Claim**

Notwithstanding any other provisions of the Plan, no claimant will be entitled to receive distributions aggregating more than its Allowed Claim, nor will any claimant receive any distributions under the Plan until its Claim has been Allowed.

**6.2     Distributions**

Distributions to Holders of Allowed Claims must be made by the Liquidation Trustee: (a) at the addresses set forth on the proofs of claim filed by such Holders (or at the last known addresses of such Holders if no proof of claim is filed or if the Debtor has been notified of a change of address), (b) at the addresses set forth in any written notices of address changes delivered to the Debtor or the Liquidation Trustee after the date of any related proof of claim, or (c) at the addresses reflected on the Schedules if no proof of claim has been filed and the Debtor or the Liquidation Trustee has not received a written notice of a change of address. If any Allowed Claim Holder's distribution is returned as undeliverable, no further distributions to such Holder can be made unless and until the Debtor or the Liquidation Trustee is notified in writing of such Holder's then current address, at which time all missed distributions must be made to such Holder without interest. Any undeliverable distribution made will be held for redistribution under this Plan. All claims for undeliverable distributions must be made no later than six (6) months after the distribution is made, after which date all unclaimed property reverts to the Liquidation Trust free of any restrictions thereon, and the Claim of any Holder or successor to such Holder with respect to such property will be automatically discharged and forever barred notwithstanding any federal or state escheat laws to the contrary. Nothing contained in the Plan requires the Debtor or the Liquidation Trustee or any professional retained by the foregoing to attempt to locate any Holder of an Allowed Claim.   All distributions must be allocated first to principal until the principal amount of the Claim is paid in full, next to interest ifinterest is Allowed in relation to the Claim and finally, to fees, costs and expenses if such are Allowed.

**6.3     Time of Payment**

Except as may be provided herein or in the Liquidation Trust Agreement, all distributions provided for by the Plan will be made as soon as it is feasible in the reasonable discretion of the Liquidation Trustee. The Liquidation Trustee may make one or more distributions.

**6.4     Disputed Claims Reserves**

On any date that distributions are to be made on account of Allowed Claims, the Liquidation Trustee must make a reasonable reserve on account of Disputed Claims and will adjust the reserve periodically, which must equal no less than the amount of the Disputed Claims multiplied by the Pro Rata Distribution to be made on account of Allowed Claims. Such Disputed Claim reserve will be administered by the Liquidation Trustee. The reserve will be closed and extinguished by the Liquidation Trustee upon the determination that all distributions and other dispositions of Cash, or other distributions required to be made under the Plan have been made in accordance with the terms of the Plan. Upon closure of a Disputed Claim reserve, all Cash will be subject to redistribution, in accordance with the provisions of the Plan.

**6.5     Estimation of Claims**

The Liquidation Trustee may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claims, including any Claim for taxes, to the extent permitted

by section 502(c) of the Bankruptcy Code regardless of whether the Debtor or the Liquidation Trustee, as the case may be, has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court retains jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount constitutes either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Liquidation Trustee may elect to pursue supplemental proceedings to object to any ultimate allowance of such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

**6.6    Objections to Claims**

Unless deemed Allowed in the Plan, the Debtor or the Committee (prior to the Effective Date) and the Liquidation Trust (after the Effective Date), as applicable, may object to the allowance and priority of any Claim, or the extent, validity and enforcement of any security interest, whether listed on the Schedules or filed by any Creditor on or before the Claims Objection Bar Date. Any Claim not the subject of a timely objection is be an Allowed Claim.

**6.7    Untimely Claims**

Except as provided herein or otherwise agreed, any and all Proofs of Claim filed after the Proofs of Claim Bar Date, or not timely filed pursuant to the any applicable order of the Bankruptcy Court or the provisions of the Plan, will be a Disallowed Claim and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Disallowed Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Date such late Claim has been deemed timely Filed by a Final Order.

**6.8    Fractional Cents**

Notwithstanding any other provision of the Plan to the contrary, no payment of fractional cents may be made pursuant to the Plan. Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual distribution made will reflect a rounding of such fraction to the nearest whole penny (up or down), with half cents or more being rounded up and fractions less than half of a cent being rounded down. No distributions of less than $25.00 will be made on account of Allowed Claims, and the Liquidation Trustee may contribute any balance in the Liquidation Trust that is not distributed to Access to Bankruptcy Court, or a similar non-profit organization selected by the Liquidation Trustee.

**6.9    Interest on Claims**

Interest will not accrue on Claims, and no Holder of a Claim is entitled to interest accruing on any Claim unless provided pursuant to the terms of the Plan or the Bankruptcy Code; provided, however, that no distributions can be made to equity interests until all General

Unsecured Claims have been paid in full with interest as provided under applicable law. Distributions in respect of Allowed Claims must be allocated first to the principal amount (as determined for federal income tax purposes) of such Claims, and then, to the extent the consideration exceeds the principal amount of such Claims, to any portion of such Claims for accrued but unpaid interest.

**6.10    Setoffs by Liquidation Trustee**

Except as otherwise provided in the Plan, the Liquidation Trustee may set off against any Claim and the distributions to be made pursuant to the Plan in respect of such Claim, any claims of any nature whatsoever that the Debtor may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan constitutes a waiver or release by the Liquidation Trustee of any claim or any right of setoff against the Holder of such Claim. Setoffs against the Debtor are governed by Section 13.1 of the Plan.

**6.11    Recoupment**

Except as otherwise permitted under this Plan, in no event will any Holder of a Claim or Interest be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Liquidation Trust unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtor on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

**6.12    Compliance with Tax Requirements and Allocations**

The Debtor and the Liquidation Trust are be authorized to take all actions necessary or appropriate to comply with all tax withholding and reporting requirements imposed on them by any governmental unit, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Debtor and the Liquidation Trust each reserve the right, in their sole discretion, to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, other spousal awards, Liens, and encumbrances.

**6.13    Waiver of Transfer Taxes**

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of security or the making or delivery of an instrument of transfer under the Plan after the Effective Date cannot be taxed under any law imposing a stamp tax or similar tax.

**6.14    Time Bar to Cash Payments by Check**

Checks issued by the Liquidation Trustee on account of Allowed Claims will be null and void if not negotiated within one hundred twenty (120) days after the date of issuance thereof, except those returned as undeliverable which must be dealt with in accordance with Section 6.2 of the Plan. After such date, all Claims in respect of void checks will be forever

24

barred, and the proceeds of such checks revest in the Liquidation Trust subject to redistribution in accordance with the provisions of the Plan.

# ARTICLE VII

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES UNDER THE PLAN

### 7.1    Executory Contracts and Unexpired Leases

Except as may otherwise be provided in the Plan, unless already assumed or rejected by Final Order of the Bankruptcy Court prior to the Effective Date, all executory contracts and unexpired leases of the Debtor which are not the subject of a pending application to assume as of the Effective Date are rejected.

### 7.2    Compensation and Benefit Programs

All Compensation and Benefits Programs sponsored by the Debtor, if any, are executory contracts under the Plan and the Code. All Compensation and Benefit Programs are rejected and terminated on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.

### 7.3    Rejection Claims

Any creditor who has a Claim as a result of a rejection of an executory contract or unexpired lease ("Rejection Claim") can file a proof of claim for rejection damages within thirty (30) days after the Effective Date, failing which such Claim will not be treated as an Allowed Claim for purposes of distribution and may be expunged from the Claims Register in the Bankruptcy Case unless the Court enters a Final Order to the contrary after notice and an opportunity for hearing.

# ARTICLE VIII

## RETENTION OF SUBJECT MATTER JURISDICTION

### 8.1    Retention of Subject Matter Jurisdiction

The Bankruptcy Court retains subject matter jurisdiction of all matters and over all Persons arising out of, and relating to, the Case and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

a.     to consider and rule on the compromise and settlement of any Claim against or Cause of Action on behalf of the Debtor or the Estate;

b. to ensure that distributions to Holders of Allowed Claims are accomplished as provided herein;

c. to hear and determine any timely objections to Administrative Expense Claims or to proofs of claim filed, both before and after the Effective Date, including any objections to the classification of any Claim or Equity Interest, the allowance or disallowance of any Claim, in whole or in part, and any disputes arising from the settlements of Claims;

d. to hear and determine any and all applications for the allowance of Professional Fees as provided for in the Plan;

e. to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

f. to issue such orders in aid of execution of the Plan, in accordance with section 1142 of the Bankruptcy Code;

g. to estimate Claims for all purposes under the Plan;

h. to consider any amendments or modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in the Plan, including any exhibit thereto, or in any order of the Bankruptcy Court, including the Confirmation Order, necessary to carry out the purposes and intent of the Plan and to implement and effectuate the Plan;

i. to hear and determine matters concerning state, local and federal taxes, including but not limited to those in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, with respect to the Debtor or any Person;

j. to compel the conveyance of property and other performance contemplated under the Plan and documents executed in connection herewith;

k. to enforce remedies upon any default under the Plan;

1. to enforce, interpret and determine any disputes arising in connection with any orders, stipulations, judgments and rulings entered in connection with the Case (whether or not the Case has been closed);

m. to resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or the Liquidation Trust, or any Person's obligations incurred in connection herewith;

n. to determine any other matters that arise in connection with or relate to the Plan, the Liquidation Trust Agreement, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or

26

document created in connection with the Plan, the Liquidation Trust Agreement, or the Disclosure Statement;

o.      to issue injunctions, enter and implement other orders or take such other actions necessary or appropriate to restrain interference by any Person with the occurrence of the Effective Date or enforcement of the Plan;

p.      to issue such orders necessary or appropriate in aid of confirmation and/or to facilitate consummation of the Plan;

q.      to determine such other matters provided for in the Confirmation Order or other orders of the Bankruptcy Court authorized under the provisions of the Bankruptcy Code or any other applicable law;

r.      to hear and determine (a) all motions, applications, adversary proceedings, and contested matters pending on the Effective Date, and (b) all Causes of Action by or Claims against the Debtor arising under the Bankruptcy Code or non-bankruptcy law, if made applicable by the Bankruptcy Code, whether such Causes of Action or Claims are commenced before or after the Effective Date, including, but not limited to, Chapter 5 Claims;

s.      to determine all Causes of Action, to the extent not described in subsection (r) above, including, without limitation, (i) suppliers of goods or services to the Debtor; and (ii) any shareholder, insider or affiliate of the Debtor, for any actions or omissions prior to the Petition Date; and

t.      to enter a Final Decree.

## ARTICLE IX

## MODIFICATION OF PLAN

### 9.1     Prior to the Confirmation Date

The Debtor may alter, amend or modify the Plan or any exhibits thereto under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date after notice and an opportunity for hearing to affected parties. The Debtor will provide parties-in-interest with notice of such amendments or modifications required by the Bankruptcy Code or Rules or by order of the Bankruptcy Court. A Holder of a Claim that has accepted the Plan will be deemed to have accepted the Plan, as altered, amended, modified or clarified, if the proposed alteration, amendment, modification or clarification does not materially adversely change the treatment of the Claim of such Holder.

### 9.2     After the Confirmation Date and Before Substantial Consummation

After the Confirmation Date and prior to Substantial Consummation of the Plan, the Debtor may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the

Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, and such matters necessary to carry out the purpose and effect of the Plan so long as such proceedings do not materially adversely affect the treatment of Holders of Claims under the Plan; provided, however, that, to the extent required, prior notice of such proceedings must be served in accordance with the Bankruptcy Code or Rules or an order of the Bankruptcy Court. A Holder of a Claim that has accepted the Plan will be deemed to have accepted the Plan, as altered, amended, modified or clarified, if the proposed alteration, amendment, modification or clarification does not materially and adversely change the treatment of the Claim of such Holder.

## ARTICLE X

## PROVISIONS REGARDING INJUNCTION, INDEMNIFICATION AND EXCULPATION

### 10.1   Injunction relating to the Plan

To the fullest extent provided in Sections 105 and 1141 of the Bankruptcy Code, as of the Effective Date, all Persons that have held, currently hold or may hold a Claim or other debt or liability or Equity Interest that is addressed in the Plan are permanently enjoined from taking any action against the Debtor, the Liquidation Trust or the Liquidation Trustee on account of such Claims, debts, liabilities or interest, other than actions brought to enforce any rights or obligations under the Plan.

### 10.2   Indemnification

The Debtor shall provide indemnification to current and former directors and officers, employees and agents including, with the scope of such indemnification being as provided in the bylaws of the Debtor or any contract signed by the Debtor (each person entitled to indemnification is an "Indemnitee") and such provisions are deemed assumed and survive the effectiveness of the Plan; provided, however, that notwithstanding anything to the contrary contained in this Plan or the Debtor's bylaws, (i) any indemnification by the Liquidation Trust will only be available to the Indemnitee to the extent not covered by any D&O insurance policy of or relating to the Debtor; and (ii) any Claim for indemnification not fully covered under sections 10.2 or 10.3 of the Plan (y) will be Allowed as an Administrative Expense Claim or a General Unsecured Claim, as the case may be, upon agreement of the parties or the order of the Bankruptcy Court; and (z) notwithstanding the Administrative Claim Bar Date or the Proof of Claim Bar Date, may be filed by the Indemnitee at any time prior to the first distribution to the Holders of Class 7 Claims.

### 10.3   Assumption of D&O Insurance Policy

As of the Effective Date, the Liquidation Trust will automatically assume any unexpired directors' and officers' liability insurance policy (including any tail policy or rider purchased before the Effective Date) of or relating to the Debtor pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the foregoing assumption of each such unexpired directors' and officers' liability

insurance policy. Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan does not discharge, impair or otherwise modify any indemnity obligations assumed by the foregoing assumption of the unexpired directors' and officers' liability insurance policies, and each such indemnity obligation will be deemed and treated as an executory contract that has been assumed by the Debtor under the Plan as to which no proof of claim need be filed..

**10.4     Exculpation**

*To the fullest extent provided by applicable law, the Exculpated Party will neither have nor incur, and each Exculpated Party is exculpated from,  any liability to any Holder of a Claim or Interest for any action or omission in connection with, related to, or arising out of, the Chapter 11 Case, the preparation or formulation of the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan, or property to be distributed under the Plan or the Liquidation Trust Agreement, except for actions determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.*

**ARTICLE XI**

**BAR DATES FOR CERTAIN CLAIMS**

**11.1     Bar Date for Professionals**

Subject to the provisions of sections 328, 330 and 331 of the Bankruptcy Code, all Professionals seeking an award by the Bankruptcy Court of Professional Fees, must file their respective final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date within thirty (30) days after the Effective Date.

**11.2     Bar Date for Administrative Expenses**

No Administrative Expense Claim will be an Allowed Administrative Expense Claim and such a Claim will be forever barred and enjoined if it is not filed by the Administrative Claim Bar Date, provided, however, that the Liquidation Trustee, professionals for the Liquidation Trustee and others providing services to the Liquidation Trustee will not be subject to the Administrative Claim Bar Date.

# ARTICLE XII

## EFFECT OF CONFIRMATION

### 12.1    Settlement of Indebtedness

*Except as otherwise provided in this Plan, the confirmation of this Plan will, and does hereby act as a full, total, and complete settlement and judgment with respect to all Claims of all Creditors against Debtor. Confirmation will also act as an injunction against all Creditors from taking any actions to collect or enforce Claims against Debtor or the Liquidation Trust except as set forth in this Plan. The forgoing notwithstanding, the Debtor is not entitled to a discharge under Section 1141; and this paragraph will not affect the rights of any taxing authority against any other entity or person who may be liable or responsible for the taxes of the Reorganized Debtor.*

### 12.2    Release of Liens

*Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document assumed, entered into or delivered in connection with the Plan, on the Effective Date and concurrently upon the receipt by the counterparty of payment in full of the applicable Distributions pursuant to Article III of the Plan, all mortgages, deeds of trust, liens, or other security interests against any property are automatically fully released and discharged, and all of the right, title and interest of any Holder of such mortgages, deeds of trust, liens or other security interests, including any rights to any collateral thereunder, reverts to the Liquidation Trustee, provided, however the liens and security interests provided to the Agent under the Consulting Agreement shall survive confirmation of the Plan and the Effective Date..*

# ARTICLE XIII

## MISCELLANEOUS PROVISIONS

### 13.1    Setoffs and Counterclaims

No Creditor (including without limitation a Person or Entity that becomes a Creditor as a result of a rejection of a contract) can set off a Claim against an obligation to the Debtor arising in connection with a different contract. Unless expressly asserted in the Chapter 11 Case through the filing of a motion with the Bankruptcy Court or in the Plan, all setoffs and counterclaims are waived notwithstanding any assertion in any proof of claim. The terms of this section do not apply to any taxing authority.

### 13.2    Exhibits.

All Exhibits are incorporated into and are a part of this Plan as if set forth in full herein and, to the extent not annexed hereto, such Exhibits must be filed with the Bankruptcy Court. Upon its filing, the Exhibit may be inspected (a) in the office of the clerk of the Bankruptcy

Court or its designee during normal business hours or at the Bankruptcy Court's website for a fee at https://ecf.mieb.uscourts.gov or (b) with the Ballot Agent at https://cases.stretto.com/LovesFurniture. The Exhibits may also be requested in writing from the Debtor's counsel. All Exhibits may be revised prior to the Confirmation Date and revised Exhibits will be Filed with the Bankruptcy Court, so long as the revised Exhibits are substantially in conformance with the terms of this Plan or any Amendment to it. The Exhibits are an integral part of the Plan, and entry of the Confirmation Order by the Bankruptcy Court will constitute approval of the Exhibits.

## 13.3    Notices

All notices, requests and demands to be effective must be in writing (including by facsimile transmission and email) and, unless otherwise expressly provided herein, will be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

|  |  |
|---|---|
| To the Debtor: | Butzel Long<br>Stoneridge West<br>41000 Woodward Ave.<br>Bloomfield Hills, MI 48304<br>Attn: Max Newman, Esq.<br>Tel: (248) 258-1616<br>Fax: 248-258-1439<br>Email: newman@butzel.com |
| To the Committee: | Foley & Lardner LLP<br>500 Woodward Ave., Ste 2700<br>Detroit, MI 48226<br>Attn:  Ann Marie Uetz, Esq.<br>Tel: (313) 234-7114<br>Fax:  (313) 234-2800<br>Email:  auetz@foley.com |
| To the Liquidation Trustee: | TBD |

## 13.3    Conflicts.

In the event of any conflict or inconsistency between the terms of (a) the Plan (including all exhibits to the Plan), and (b) the Disclosure Statement, the terms of the Plan will control.

## 13.4    Reservation of Rights.

If the Plan is not confirmed by a Final Order, or if the Plan is confirmed and does not become effective, the rights of all parties in interest in the Bankruptcy Case are reserved in full. Any concessions or settlements reflected herein, if any, are made for purposes of the Plan only, and if the Plan does not become effective, no party in interest in the Bankruptcy Case will be bound or deemed prejudiced by any such concession or settlement.

**13.5    Entire Agreement**.

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**13.6    Severability.**

The provisions of this Plan will not be severable unless such severance is agreed to by the Debtor and such severance would constitute a permissible modification of the Plan pursuant to Section 1127 of the Bankruptcy Code.

**13.7    Filing of Additional Documents.**

On or before the Effective Date, the Debtor may File with the Bankruptcy Court such agreements and other documents necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**13.8    Binding Effect**

The rights, benefits and obligations of any Person named or referred to in the Plan, or whose actions may be required to effectuate the terms of the Plan is binding on, and inures to the benefit of, any heir, executor, administrator, successor or assign of such Person (including, but not limited to, any trustee appointed for Debtor under Chapters 7 or 11 of the Bankruptcy Code). The Confirmation Order must provide that the terms and provisions of the Plan and the Confirmation Order will survive and remain effective after entry of any order which may be entered converting the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code, and the terms and provisions of the Plan will continue to be effective in this or any superseding case under the Bankruptcy Code.

**13.9    Section Headings**.

The section headings contained in this Plan are for reference purposes only and do not affect in any way the meaning or interpretation of the Plan.

**13.10   Further Information**.

Requests for further information regarding the Debtor should be directed to the Debtor's counsel listed above.

**[DISCLOSURE STATEMENT BEGINS ON THE FOLLOWING PAGE]**

# DISCLOSURE STATEMENT

The Debtor propose the following disclosure statement (the **"Disclosure Statement"**) pursuant to Section 1125(b) of the Bankruptcy Code and the Court's Requirements for Information to Include in the Disclosure Statement[3] for use in the solicitation of votes on the above Plan**.** All capitalized terms used herein, unless otherwise provided, have the meanings set forth in Article I of the Plan.

## I.  A DESCRIPTION OF THE DEBTOR.

**A.**    Loves Furniture Inc., d/b/a Loves Furniture and Mattresses is a Delaware corporation with its principal place of business in Macomb County Michigan. Loves is a wholly-owned subsidiary of US Assets, Inc. ("US Assets"), a Nevada corporation based in Dallas, Texas. US Assets is wholly owned by T & L Financial, Inc., which is 94.01% owned by Jeff Love a Texas resident.  The Debtor was incorporated on April 2, 2020, although it did not commence retail operations until August 28, 2020.

The Debtor is liquidating its assets and not continuing in business pursuant to the Store Closing Order and the Plan.

**B.    Description of Principal**.

**1.    Background**.

Mr. Love is the sole member of the Debtor's Board of Directors and the President of the Debtor.  Mr. Love also is the founder and CEO of US Assets, Inc., a Dallas-based private equity firm started in 2014 to purchase, own and enhance the profitability of, existing companies through fresh capital, increased liquidity and monetization of existing assets. US Assets' current and historical portfolio includes retail, real estate brokerage, financial consulting, healthcare, food services, fitness, convenience stores and pet care services.

Prior to his involvement with the Debtor, Mr. Love had no background in, or experience with the furniture industry.  Instead, US Assets hired a number of former Art Van[4] employees to provide the necessary furniture industry experience.  Mr. Love has not been involved in the Debtor's day-to-day business operations during its bankruptcy.

**2.    Compensation of Principal**

---

[3] This document appears on the Court's web site at http://www.mieb.uscourts.gov/judges-info/judge-tucker.

[4] The full name of this entity is Art Van Furniture, LLC.  Art Van Furniture, LLC was a Michigan-based retail furniture store founded in 1959, which became a major regional furniture retailer which peaked at 141 stores, plus 45 additional freestanding mattress stores.  As described below, Art Van filed Chapter 11 in Delaware on March 8, 2020.

Prior to the Petition Date, Mr. Love received a total of $115,386 as salary from the Debtor, all paid between September 18, 2020 and December 24, 2020.  Mr. Love has not received any fringe benefits from the Debtor at any time; nor has he received any post-petition compensation from the Debtor.

### 3. Legal Relationships between Insiders, Affiliates and the Debtor.

Prior to the Petition Date, the Debtor's bank accounts were managed by US Assets and US Assets would pay the Debtor's expenses out funds in the Debtor's bank accounts when directed by the Debtor. If there were insufficient funds to pay all of the Debtor's expenses at any given time, US Assets had the discretion to determine what bills would be paid, and when.

In addition, the Debtor received loans and other payments from insiders.  Below is a summary of loan transactions from insiders.  The source of all information contained in this section is US Assets as of December 8, 2020.

### SUMMARY OF OUTSTANDING INTERCOMPANY[5] NOTES ASSERTED AGAINST LOVES FURNITURE, INC. BY AFFILIATES

| PAYEE | BALANCE | DATE |
|---|---|---|
| TJKZ Construction, LLC | $150,000 | 10/23/20 |
| TJKZ Construction, LLC | $50,000 | 10/23/20 |
| TJKZ Construction, LLC | $50,000 | 7/23/20 |
| US Assets Acquisition, LLC | $15,000 | 10/23/20 |
| US Assets Inc. | $17,000 | 4/29/20 |
| US Assets Inc. | $100,000 | 7/20/20 |
| US Assets Inc. | $500,000 | 7/23/20 |
| US Assets Inc. | $500,000 | 7/23/20 |
| US Assets Inc. | $415,585 | 9/2/20 |
| US Assets Inc. | $325,000 | 9/10/20 |
| US Assets Inc. | $1,070,000 | 9/16/20 |
| US Assets Inc. | $700,000 | 10/1/20 |
| US Assets Inc. | $1,850,000 | 10/9/20 |
| US Assets Inc. | $1,790,000 | 10/13/20 |
| US Assets Inc. | $130,000 | 10/23/20 |
| US Assets Inc. | $280,000 | 11/10/20 |
| US Assets Inc. | $228,200 | 9/2/20 |
| US C-Store Operations, LLC | $15,000 | 10/23/20 |
| US Pets, Inc. | $100,000 | 10/23/20 |
| US Realty Co | $20,000 | 10/23/20 |
| White Oak Station, LLC | $10,000 | 10/23/20 |
| Total | $8,315,785 | |

---

[5] All of entities involved here were either US Assets or wholly-owned affiliates of US Assets.

The Debtor's books and records show that the Debtor made payments of $2,617,000 towards these loans made between June 17, 2020 and December 21, 2020.

The Debtor's books and records also show a loan from the Debtor to US Assets June 18, 2020 in the principal amount of $500,000.

US Assets. issued guarantees of numerous obligations of the Debtor. These obligations include, but are not limited to, the following:

| Affiliate Issuing Guaranty | Creditors |
|---|---|
| US Assets, Inc. | A & R Properties, Affordable Furniture, Agree Realty, Avalon, Element, Essential Properties, Flexsteel, Franklin, , Hooker/Home Meridian, Independent LL, JWSC Limited Partnership II, Kuehne & Nagel, Kuka, LCN, LFN, Najarian, NTVB, Oriental Weavers, RDB Davison Rd. LLC, SBV-Holland, LLC, Serta Restokraft, Sherwood Mattress, Southern Motion/Fusion, The Simmons MFG, Co. LLC, Argyle Malls, STORE Capital Acquisition LLC |

Records of the Debtor's transactions with US Assets and its affiliates are maintained by US Assets.

### C. Description of the Debtor's Business, Its Industry Group and the Causes of the Chapter 11 Filing.

#### 1. Events Leading up to Commencement of Operations

The Debtor was founded to fill the vacuum in the midwestern retail furniture market created as a result of the bankruptcy and liquidation of Art Van Furniture, LLC and its affiliates (together, "Art Van"). Art Van filed Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware on March 8, 2020. Art Van had intended to conduct going-out-of-business sales at substantially all of its locations. However, Art Van's Chapter 11 filing coincided with the initially outbreak of the COVID-19 pandemic in the United States. Almost immediately, Art Van's locations shut down because customers were not coming due to COVID and staff was reluctant to work even before local and state government quarantine orders were issued. As a result, Art Van shut down its stores and converted its Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code on April 7, 2020.

The Art Van bankruptcy left numerous long-standing furniture store locations with substantial historical sales without tenants or operations. Moreover, Art Van abandoned substantial furniture inventory which could be sold to jump start a new furniture company.

The Debtor's initial connection to the Art Van bankruptcy came through STORE Capital and Essential Properties which had preexisting business relationships with US Assets. STORE and Essential leased at least 27 locations to Art Van. STORE and Essential offered to lease these locations to the Debtor, which could use the locations as a base for expansion to become at least a regional furniture industry market player. In order to facilitate the Debtor's decision to incorporate STORE offered initial inventory financing and significant tenant improvement allowances, as well as long-term leases. Ultimately, the Debtor signed leases for 23 locations from STORE and 4 from Essential, although a number of these locations never opened as Loves stores.

As part of its business plan, by mid-April 2020, the Debtor hired its initial management staff. In addition to signing leases with STORE beginning May 4, 2020, the company continued to hire additional staff responsible for planning, ordering, readying and marketing the soon-to-be-opened Loves locations. Debtor also negotiated with other landlords, ultimately signing leases on multiple former Art Van retail locations, as well as Art Van's headquarters.

**Square One Sale.** As noted above, Art Van abandoned substantial furniture inventory which could be sold by a new furniture company. Additional furniture inventory was bought from Art Van by US Assets or its affiliates and contributed to Loves. In Order to raise cash, and to facilitate the sale of the former Art Van inventory, the Debtor entered into an agreement with PFP to conduct liquidation sales at the former Art Van locations under an assumed name of Square One. As a result of the Square One sale, the Debtor received 50% of the profits of sale (subject to the holdback described in the next paragraph). As of the commencement of the case, the Debtor had received $3,025,088.02 as a distribution of profits from the Square One sale.

Under the contract related to the Square One sale, PFP had the right to hold a portion of the profits for 180 days to make certain that all expenses of sale were paid, that there were not customer returns, and that there were no other unanticipated costs. As of January 23, 2021, there was $922,744.33 being held, of which the Debtor was entitled to payment of 50%. While some minimal additional expenses may have accrued since January 23, the Debtor believes that it is entitled to more than $450,000 as a final distribution from the Square One Sale. As the Square One sale ended in November 2020, the payment to the Debtor should occur in May 2021, or such other time as agreed by the Debtor (after consultation with the Committee) and PFP or pursuant to an order of the Bankruptcy Court.

**Capitalization.** The Debtor's books and records disclose that pre-store opening expenses and inventory acquisitions were funded primarily through loans or guarantees by US Assets and its affiliated entities, as well as STORE. They do not reflect any contribution of capital other than the contribution of inventory acquired from the Art Van bankruptcy estate by US Assets (the inventory was acquired using money borrowed by US Assets from STORE Capital) through a court order entered in the Art Van bankruptcy estate and was the inventory sold in the Square One sale.

### The Debtor's Historical Operations

After acquisition of its locations, Loves needed to refurbish the locations to make them more appealing to consumers and to differentiate itself from Art Van. Loves also needed to install COVID-19-required barriers. The total cost of refurbishments on the locations was

37

$4,084,780, some of which remains unpaid as of the Petition Date. This created more burden on the new entity, and more requirement for speedy commencement of operations and reduction of costs.

The Debtor's first locations opened on August 28, 2020. To begin its operations, the Debtor ordered inventory at an aggregate landed cost of $60,000,000, of which approximately $38,000,000 was received. The Debtor paid approximately $17,200,000 towards that inventory, from proceeds of operations as well as from the proceeds of secured and unsecured loans as described in the Plan and this Disclosure Statement.

As with most retail furniture companies, the Debtor did not generally sell merchandise from the floor. Rather store locations display an assortment of goods available for purchase which would then be shipped to the customer from a centralized warehouse or delivered to the store for customer pick up. The Debtor suffered severe consequences from this model. The Debtor's warehousing and logistics problems can be divided into several categories:

a. Interim Warehousing. The Debtor's main warehouse in Warren, Michigan was leased from LCN, and was not available until October 1, 2020. This meant that the Debtor had to receive its initial inventory, and stock its initial locations from smaller warehouses, primarily a warehouse in Burton, Michigan. While the Debtor only intended to use the Burton Warehouse from August 28, 2020 until October 1, 2020, it had to sign a 6-month lease at $215,000 per month, plus pay a $215,000 security deposit.

It quickly became clear that the Burton warehouse was not large enough to hold all of the Debtor's incoming orders. The Debtor then entered into an agreement with Evans Distribution Systems to lease approximately a minimum of 100,000 square feet of warehouse space to store mattresses at its Allen Park storage facility beginning August 12, 2020 for the sum of $27,000 plus logistics cost and labor. This is referred to as "Evans 1". The agreement permitted Loves to flex up to an additional 100,000 square feet as needed, and it ultimately leased approximately 177,000 square feet from Evans. The Burton Warehouse is holding the $215,000 security deposit. Debtor claims that the Burton Warehouse released its lease to the Debtor after Debtor's move to the Warren Warehouse, and that the $215,000 security deposit should be returned. Debtor's claim for the return of this deposit is expressly preserved.

b. Penske Logistics: The Debtor hired Penske Logistics effective July 17, 2020. The relationship was unsuccessful and very costly to the Debtor for the reasons discussed more fully below.

c. Movement of Inventory into Warren. The objective of most inventory systems is to minimize the number of times stored items are touched, as each touch can cause damage, and each touch is expensive. The Debtor's inventory, on the other hand, was not just touched – it was moved from place to place. The Debtor's Inventory Management System did not communicate well with Penske's Warehouse Management System, leading to repeated and costly failures to locate inventory. Moreover, customer orders often had to be shipped from multiple warehouse locations, causing excessive shipping costs that diminished or eliminated profit from orders.

38

d.     Unnecessary, erroneous and inefficient shipments.    The Warehouse Management Issues often caused the Debtor to pay (at a flat rate) for unnecessary, erroneous or half-loaded, inefficient shipments of inventory.

e.     Loss of customer satisfaction.    Customers bought furniture with the expectation of reliable delivery times.   The Debtor's inability to reliably deliver furniture on time, with the correct items and undamaged lead to cancelation of orders and a diminished business reputation.

f.     Upset of business model.   The Debtor began as a thinly capitalized entity that required the speedy turnover of inventory and a steady high volume of orders to fund operating expenses.   The inability to deliver furniture to customers delayed or eliminated payments to the Debtor, causing the Debtor to seek merchant capital financing (at high interest rates) to pay suppliers for critically-needed inventory.   This higher cost of capital prevented the Debtor from ordering new inventory or critical operating costs.   To succeed, the business plan needed everything to go right.   The logistics problems meant that nothing did.

g.     Amounts Paid to Penske:   The Debtor paid a total of $8,310,227 to Penske. Yet the Debtor's total pre-petition sales were only approximately $30,500,000. This resulted in highly disproportionate payments to Penske amounting to more than 25% of the Debtor's total pre-petition sales revenue.

h.     Exit of Pennsylvania Market:   Because of the expense of delivering goods to the Pennsylvania market from the Debtor's warehouse in Warren, Michigan, the Debtor exited the Pennsylvania market, by agreeing to the assumption of leases for these 5 stores by Levin Furniture. These stores were leased from STORE as part of a 7 location Master Lease.   As part of this transaction, the Debtor obtained a termination of its leases for Pittsburgh, McMurray, Mt Pleasant, Altoona and State College. Levin also purchased the Debtor's inventory at those locations, with the proceeds used to refund customer deposits on any goods not delivered.

Initial sales for the Debtor were strong and comparable with projections, despite the ongoing pandemic.  The Debtor purchased over $6,300,000 in media buys to promote its new locations[6].  The layout of the stores, the quality of the merchandise and the sales employees all received initially positive reviews.  However, the inability to timely deliver inventory rapidly overwhelmed any goodwill the newly designed and stocked locations may have generated, and seriously damaged ongoing sales.

As a result of its logistical problems and their impact on the Debtor's sales and cash-flow, around December 1, 2020, Debtor significantly restructured its workforce to support a 12 store go forward model.  Reduction were made in all areas but were most significant in merchandising and advertising.  By that time, the Debtor faced a severe cash crisis and needed an infusion of at least $1.6 MM to pay its payroll and continue any operations.  Accordingly, the Debtor entered into a second Consulting and Liquidation Agreement with PFP for 12 locations.  This reduced the Debtor's operating cost, provided a much-needed cash infusion and gave the Debtor the opportunity to use the holiday sales season to turn around its remaining 12 locations.

---

[6] Much of the amounts owed for these media buys were never paid.

On December 7, 2020, the Debtor brought Mack Peters, a furniture industry expert with retail, manufacturing and wholesale experience, on board as Interim CEO to run the Debtor's day-to-day operations. Mr. Peters is the principal of M.P. Furniture, Inc. He has more than forty years of experience in the furniture industry in manufacturing, wholesale and retail aspects of the business. Mr. Peters started and operated his own furniture retail chain for twenty years and sold it to one of the largest furniture manufacturers in the country. Mr. Peters also worked in furniture manufacturing and wholesale sales before he was engaged by the Debtor to leverage his retail, manufacturing and wholesale experience. For his services, Mr. Peters' firm, M P Furniture, receives a biweekly fee of $16,346.15.

Unfortunately, the Debtor's inability to locate and deliver inventory ordered by customers in its inventory reduced holiday sales and caused significant cancelations of orders. As a result, by January 6, 2021, the Debtor needed an immediate cash infusion of at least $2,500,000 to pay payroll, utilities and other critical operating expenses. In late December, the Debtor employed B. Riley Financial Advisors as financial consultants and, on December 31, 2020, hired Butzel Long, P.C. as insolvency counsel. Due to its immediate cash crunch, the Debtor had no choice but to turn to PFP to commence liquidation sales at its remaining 12 locations, which permitted a $2,500,000 Advance (the "Agent Advance") to cover payroll and other critical expenses.

By this time, the Debtor also experienced "stop shipments" from suppliers and the commencement of litigation, including an injunction action from Penske Logistics which, if successful, would have cut off the Debtor's ability to sell the approximately $10,000,000 (cost value) inventory in its warehouse. In Order to facilitate store closing sales by the Agent in an orderly manner, the Debtor commenced this Chapter 11 case with the objective of restructuring its operations with a smaller footprint. As of the date of this Plan, the Debtor has not been able to find additional financing and without such financing, has concluded that liquidation is the best option.

## II.     POST-PETITION EVENTS OF SIGNIFICANCE.

A.     Description of Post-Petition Litigation.

The summary of any Order in this section is qualified by the full terms of the Order, and parties in interest are advised to consult the text of the orders, which are available without cost through Stretto, Loves' Claims Agent, at **https://cases.stretto.com/LovesFurniture.** Discussion of transfers outside the ordinary course of business and of cash collateral and adequate protection orders are included in the summaries of the most notable post-petition orders below.

1.     **The Store Closing Order**

On January 15, 2021, the Court entered Store Closing Order as an interim order, DE 62. On February 5, 2021, the Court entered the Store Closing Order as a final Order. The Store Closing Order authorized the Debtor's retention of the Agent and approved the Sales Promotion Consulting Agreement between the Debtor and the Agent. Since January 16, 2021, and pursuant to the Interim Sale Order and the Final Sale Order, the Agent has been conducting Store Closing Sales ("Sales") at its leased locations. By the Effective Date, it is expected that the Sales will be completed.

40

The Store Closing Order also provided for the Agent's payment of the Agent Advance, a $2,500,000 advance payment of the Debtor's share of the proceeds of the Sales which allowed the Debtor to pay necessary administrative expenses, including payroll, as well as $200,000 as an Augment Fee (as that term is defined in the Store Closing Order) to assist the Debtor to resolve the claims of Priority Deposit Customers. The Plan is not intended to alter in any way the terms of repayment of the Agent Advance or the Augment Fee.

The Store Closing Order and the Sale Promotion Consulting Agreement are complex and cannot be easily summarized. Broadly, they provide for a going-out-of-business sale of both the Debtor's inventory and augmented inventory provided by the Agent at all of the Debtor's locations. The Debtor's share of the proceeds of the Sales are:

      a.     The Company Inventory Payment, which is 50% of the gross sale price of the Company's Inventory, paid on a weekly basis in arrears; and

      b.     80% of the Sale Profit, which is calculated from the gross sales of both Company Inventory and Augment Inventory after deduction of Sales Expenses, the Agent's 9% fee and a 5% fee to certain of the Agent's managers. Sales Expenses include most ordinary course obligations of operating the Debtor's stores during the Sale Term. Sales Expenses also include the Company Inventory Payment and the cost of goods sold of the Augment Inventory.

The Sales will be continued through May 31 at certain locations, and through June 30 at others. The exact dates that the Sales will end at each location is still being discussed between the Debtor, the Agent and the Committee, and information about the dates the Sales will end will be contained in the Plan Supplement.

The Store Closing Order contains other significant provisions including the following:

a. The Sales and Consulting Agreement between the Debtor and the Agent was a good-faith, arm's length's transaction between unrelated parties;
b. The Store Closing Procedures contained in the Order were reasonable and appropriate;
c. All adequate protection arrangements were made through the Final Cash Collateral Order, and no additional adequate protection other than a replacement lien for PFP was necessary in the Store Closing Order;
d. The Agent was authorized to supplement the company inventory with Augment Inventory. No other party to the case had any claim to any of the Augment Inventory, but the proceeds of Augment Inventory sales would be deposited in the Sale Account maintained by the Agent and would be subject to the ultimate distribution of profits from the Sale;
e. The Store Closing Order provided for the creation of the Professional Fee Escrow Account;
f. To the extent that there is a loss on the Sale, the Agent was entitled to adequate protection through a replacement lien and through a superpriority administrative claim to the extent of the loss;

41

g. The Debtor may discontinue operations at each closing store upon the conclusion of the sale term. The sale term is determined by the Agent in consultation with the Debtor and was limited to no more than 180 days. By mutual agreement, the Debtor and the Agent may terminate the sale before the end of the Term;

h. The Debtor and the Agent were given broad authority to take necessary and appropriate action to promote and conduct the sales free from interference by third parties;

i. All sales of Company Inventory and Additional Inventory will be "as is" and final.

j. The Agent was obligated to collect, remit to the Debtor and account for sales taxes, and it was strictly and only the Debtor's obligation to pay the sales taxes to the appropriate taxing authorities;

k. The Agent will not be not liable for any claims against the Debtor nor will the Agent have any successorship liabilities whatsoever and the Debtor will not be liable for any claims against Agent, in each case, other than as expressly provided for in the Consulting Agreement;

l. The Agent acts solely as an independent agent of the Debtor and will not be deemed to be an employer, or a joint or successor employer or a related or common employer or payor within the meaning of any legislation governing employment or labor standards or pension benefits or health and safety or other statute, regulation or rule of law or equity for any purpose whatsoever, and will not incur any successor liability whatsoever."

m. The Agent's funds are not subject to surcharge or use by the Debtor;

n. Within 30 days of the conclusion of the Sales, the Debtor must file with the Court a summary report of the store closing process, listing the stores close and gross revenues from the assets sold, as well as a report showing payment of the Agent's fees.

2.      **The Final Cash Collateral Order**

The Final Cash Collateral Order was entered in the Case on February 18, 2021. There were several creditors claiming Liens on the Debtor's inventory and the proceeds thereof as collateral for payment of their Claims. Some of these creditors also had claims against other assets of the Debtor. Under the Bankruptcy Code, in order to use its inventory, cash and the proceeds thereof, the Debtor was required to provide those creditors with adequate protection. The Debtor provided the creditors below with adequate protection in the form of (i) replacement liens on the same category of collateral as perfected, valid and unavoidable security interests and liens existed as of the Petition Date, (ii) superpriority administrative expense claims under section 507(b) of the Bankruptcy Code, to the extent that the replacement Liens fail to adequately protect the secured creditor's interest in cash collateral that existed as of the Petition Date, and (iii) in certain cases, Cash from inventory sales paid to the creditor or deposited into special escrow accounts. In particular, the Final Cash Collateral Order provides for the following:

a.      STORE – the Debtor has been paying 50% of the Company Inventory Payment for sales made at 5 of the locations leased from STORE. Initially, those stores were Shelby, Taylor, Royal Oak, Portage and Howell. When the Royal Oak store shut in late March,

2021, the location used for the adequate protection payment shifted to the Saginaw location. As of April 24, 2021, STORE has received payments towards its secured claim totaling $1,065,766.87. See Exhibit B, the Advance Payment Recovery & Escrow Funding Tracking Schedule dated May 3, 2021 (the "Tracking Schedule").

        b.      Westwood Capital, the Debtor has been paying $51,060 pursuant to a Budget approved by the Court to retire in full Westwood's first-priority all-asset oversecured lien in the principal amount of $603,470, with total payments equaling $633,144. As of April 24, 2021, Westwood Capital has received payments totaling $306,360.

        c.      Penske Logistics, Penske Logistics asserts a Disputed Secured Claim. Until March 15, 2021, the Debtor agreed to reserve $2,600,000 (wholesale cost) inventory in the Warren Warehouse to provide adequate protection to Penske Logistics. Later, Loves partially replaced the inventory set aside by paying 8% of the Company Inventory Payment into a collateral account to provide a reserve of funds towards payment to Penske Logistics if Penske's Claim is Allowed as a Secured Claim. After March 15, to obtain a complete release of the inventory holdback, the amount of payment into escrow was changed to a 30% payment, up to $100,000 per week ("Penske Adequate Protection Arrangement"). As of April 24, 2021, the amount of cash deposited into the Penske Logistics collateral account was $1,100,000. See, the Tracking Schedule.

        In addition, as part of the consideration for the Committee's consent to the entry of the Final Cash Collateral Order, the Debtor agreed to establish and reserve the lesser of (a) 8% of gross receipts, or (b) $100,000 per week, starting the week of February 15, 2021 to establish and fund an escrow account in the amount of $1,000,000 for the benefit of the Debtor's unsecured creditors which may be used at the election of the Committee either for distribution to unsecured creditors or as funding for the Litigation Trust. As of April 24, 2021, the amount of Cash deposited into this reserved fund was $595,755.29. See, the Tracking Schedule.

        The Final Cash Collateral Order also established the Professional Fee Escrow Accounts consisting of separate escrow accounts earmarked in the Budget or post-Budget for payment of the Debtor's Professionals and the Committee's Professionals each funded with, 2% of gross receipts from the Company Inventory Payments. See, the Tracking Schedule.

        3.      **Settlement with Kuehne + Nagel**

        Prior to the Petition Date, Kuehne + Nagel, a transport company, provided Debtor with certain transportation and logistics service. By November 18, 2020, Kuehne + Nagel sought to collect the sum of at least $1,684,786.28 plus weekly storage charges. On December 2, 2020, the Debtor agreed to pay that amount plus weekly storage charges. Debtor defaulted on its payment obligations to Kuehne + Nagel, and the amount due grew to nearly $3,000,000, with additional use and occupancy charges accruing daily by that point. At that time, Kuehne + Nagel was holding 133 containers of the Debtor's inventory, with the inventory held having a cost value of around $3,400,000 including use and occupancy (the "Purchased Inventory"). Kuehne + Nagel asserted, and likely possessed a valid, enforceable and perfected possessory carrier's lien on the Purchased Inventory.

43

In order to maximize the amount of inventory available at the Sales, Debtor contacted PFP to determine if PFP was interested in purchasing the inventory and including it in the Sales as Additional Inventory under the Consulting Agreement. After negotiations between the parties, Kuehne + Nagel agreed to accept $2,000,000 within 3 days of the execution of the settlement agreement in exchange for the Purchased Inventory to be paid by PFP directly to Kuehne + Nagel and to broadly release its claims against the Debtor. The Debtor also broadly released all claims against Kuehne + Nagel with respect to Kuehne + Nagel's transportation and logistics services as well as the business relationship between the Debtor and Kuehne + Nagel.

The Debtor sought Court authority for the approval of this settlement, and the settlement was approved by the Bankruptcy Court on February 10, 2021, [DE 203]. The settlement has been consummated and the Purchased Inventory used as Additional Inventory in the Sales.

4.    **Lease Rejections**

As of the date of this Plan and Disclosure Statement, the Debtor has rejected the following leases on the following dates:

| Lease – Landlord and Location | Date Rejection Motion Filed | Date of Rejection Order |
|---|---|---|
| STORE<br>1.   McMurray, PA<br>2.   Pittsburgh, PA<br>3.   Harrisburg, PA<br>4.   Lessburg, VA<br>5.   Altoona, PA<br>6.   Towson, MD<br>7.   Mt. Pleasant, PA | January 29, 2021 | March 3, 2021 |
| LCN – Dearborn, MI | February 24, 2021 | April 1, 2021 |
| LCN – Warren Excess Office Space | March 10, 2021 | April 1, 2021 |
| LCN – Warren Warehouse | March 10, 2021 | April 1, 2021 |

By Motion dated April 13, 2021, [DE 363], the Debtor sought to extend the time to assume or reject its remaining leases. On March 5, 2021, the Court entered its order extending the time to assume or reject the remaining leases to June 30, 2021 [DE 403].

5.    **Settlement with Essential**

As of the Petition Date, Debtor leased 2 locations from Essential; Battle Creek and Muskegon. Through a settlement with an effective date of February 28, 2021, Debtor's lease was terminated as to the Muskegon location, and the rent paid by the Debtor for the Battle Creek locations was reduced from approximately $16/square foot to $8/square foot.

The Debtor's Motion to approve the settlement with Essential was filed on April 6, 2021 [DE 358]. No objections have been filed.

6. **Settlement with STORE**

The Debtor has negotiated a settlement of its Master and Sub-Leases with STORE, also effective March 1, 2021, although the Settlement is still being documented between the parties. The principal terms are

    a. Until March 1, 2021, all Master Leases between Debtor and Store continued in full force as it existed on the Petition Date.

    b. The Debtor may maintain occupancy of the STORE locations at a total monthly rental rate of $389,845.55.

    c. The Master Leases shall be altered as to remove Petoskey on February 28, 2021, Royal Oak on March 31, 2021, Bay City on March 31, 2021 and Burton on March 31, 2021 respectively, with removal of any remaining locations to be agreed upon between the Debtor and STORE.

    d. Under the Final Cash Collateral Order, STORE has been receiving adequate protection equal to 50% of the Debtor's Inventory Payment and the Debtor's share of the Sale Profit received by the Debtor from the Agent pursuant to the Consulting Agreement and the Consulting Order from the sales at the following locations:

        i. Shelby Township, MI (Lakeside)

        ii. Taylor, MI

        iii. Howell, MI

        iv. Royal Oak, MI (Woodward Ave.)

        v. Portage, MI (Kalamazoo)

    e. Commencing April 4, 2021, the Royal Oak location was replaced for purposes of the payments identified in subparagraph 19(d) hereof by the Saginaw location.

    f. Debtor never operated from 3 of the STORE locations – Schaumburg, Woodridge and Columbus. STORE will not assert any post-petition claims, and Debtor shall not have any post-petition liabilities only with respect to these 3 locations.

    g. The Debtor shall provide STORE with sufficient information to permit it to track the profitability of the Sales and its likely result at the conclusion of this case.

    h. As the Debtor exits locations, STORE will become responsible for the utilities, taxes and insurance on those locations.

    i. Except as expressly provided in the settlement, nothing shall prejudice the Debtor's right to assume or reject the Master Leases or any party's right to object to either an assumption or rejection.

    j. Except as expressly provided in the settlement, nothing shall prejudice STORE's (1) right to assert a claim for allowance and payment of administrative rent due under the Master Leases, less any rent payments made

45

during the pendency of the bankruptcy case, (2) a claim for unpaid rent due on the Petition Date; and (3) a claim for rejection damages in the event the Master Leases are rejected.

7.    **Limited Key Employee Retention Plan**

By Motion dated February 11, 2021, [DE 211], the Debtor sought approval of a limited key employee retention plan covering 2 of its critical, non-insider employees, Michael Dady and Cathrine Wegner.  By Order dated March 19, 2021, [DE 317], the Court approved payment of $36,000 to Michael Dady provided that he remains employed by the Debtor through July 1, 2021 and of $56,000 to Cathrine Wegner provided that she remains employed by the Debtor through June 1, 2021.  This Motion facilitation of the Debtor's key institutional knowledge and made sure that the Debtor's legal, human resource and accounting departments were properly staffed during this case.

8.    **Motion for Authority to Pay Prepetition Sales Taxes.**  Debtor sought authority to pay two types of prepetition sales taxes.  The first were sales tax obligations that accrued prior to the Petition Date, but which were not due as of the Petition Date.  The second were prepetition sales tax obligations for which PFP, on behalf of the Debtor, had collected, but not paid (at that time), the sales tax obligations.  Debtor's Motion was granted, and a total of $1,154,156.13 in pre-petition sales tax obligations were paid including all amounts held by PFP which were remitted to the Debtor and paid to the applicable tax authorities.  As of the date of this Plan, the Debtor still owes more than $3,130,000 in pre-petition sale tax obligations.

# III.    LITIGATION AND PRESERVED CAUSES OF ACTION

A.    **LCN Motion to Compel and Post-Petition Rent**

LCN, one of the Debtor's landlords, filed its Motion of LCN AVF Warren (MI) LLC and LCN AVF Dearborn (MI) LLC Seeking Entry of an Order Compelling Debtor to Provide Immediate and Ongoing Compensation For Its Use And Occupancy of Certain Leased Premise. LCN had several leases with the Debtor, and was the landlord of the Debtor's warehouse, office space and 5 locations.  LCN's leases called for payment of rent on a quarterly basis, payable on the first of the month.  Accordingly, LCN's Motion sought payment of rent from the Debtor for the first quarter of 2021.

Debtor responded, asserting that the rent payments were prepetition obligations because they came due before the Petition Date.  On March 31, 2021, the Court entered its Opinion and Order on LCN's Motion (DE 29).  In its Opinion, the Court denied LCN's Motion, finding that all rent owed to LCN for the first quarter of 2021 was a prepetition obligation because the rent was due prior to the Petition Date.   As a result, LCN's claim for approximately $600,000 in rent is a pre-petition claim, and the $800,000 rent paid by the Debtor or the Agent on the Debtor's behalf in the first quarter should be reallocated to 2nd quarter rent.

LCN has appealed the Court's Opinion.  In addition, LCN has sought payment of in excess of $1,000,000 in in real property taxes which it asserts are should be given post-petition priority because they can be paid post-petition without penalty.  This issue remains pending

before the Court, but any such decision could be postponed if the Court agrees with the Debtor's argument that LCN's appeal effectively divested the Court of jurisdiction to hear this issue.

## B.      Adversary Proceeding against Penske Logistics

On March 4, 2021, the Debtor commenced an adversary proceeding (AP No. 21-04065) against Penske Logistics, LLC through the filing of a Complaint for Declaratory Relief, Breach of Contract, Common Law and Statutory Conversion, and Other Relief. In its Complaint, the Debtor sought, among other things, to invalidate Penske's alleged warehousemen's lien as well as a judgment for damages sustained due to Penske's breach of the July 17, 2020 Logistics Services Agreement. Penske's breaches included failing to inspect incoming goods, failing to report damaged goods to Debtor, not adhering to the proper standard of care for the goods in Debtor's warehouse, grossly mismanaging Debtor's warehouse and inventory, levying significant overcharges, and causing damage to Debtor's goods and furniture. The Debtor further sought to recover contractual, common law, and statutory tort damages against Penske for damage to its property and to compel Penske to disgorge preferential payments made within ninety (90) days of the Petition Date.

Subsequent to the filing of the adversary proceeding, it was determined that the Debtor would not need the Warren Warehouse after March 31, 2021 and could reject the Warehouse lease with LCN effective March 31st. In order to move inventory in the Warehouse to other locations before March 31st that otherwise served as adequate protection for Penske's warehousemen's lien, the Debtor, Committee and Penske agreed to modify the Penske Adequate Protection Arrangement that entailed a dismissal of the adversary proceeding without prejudice to save on costs to both parties pending a decision whether to refile the complaint after confirmation of the Plan. All Claims against Penske that were set forth in the adversary proceeding are preserved in the Plan.

## C.      Claims Against Toronto Dominion Bank Related to Reserve Funds:

Toronto Dominion Bank ("TD Bank") was the issuer of the Debtor's store-brand credit card. TD Bank has advised the Debtor that it is holding a reserve fund of $1,469,028.16 (the "TD Reserve") of the Debtor's funds. TD Bank has informed the Debtor that it will be filing a Proof of Claim in the amount of $2,268,108.23 and asserting a setoff against the full amount of the TD Reserve. TD Bank has advised the Debtor that its claim consists of a breach of contract/mistake claim against the Debtor in the approximate amount of $1,400,000 (the "Breach Claim", based on representations made by the Debtor in its original contract with TD Bank. In addition, TD Bank asserts more than $800,000 in claims based on customer chargebacks for goods not delivered by Debtor to customers who subsequently disputed the claims on their charge cards (the "Chargeback Claim"). The Debtor has not had a full opportunity to investigate the Chargeback Claims and disputes the amount of the Chargeback Claim and the validity of the Breach Claim.[7]

## D.      Claims Against LCN

---

[7] Debtor's best estimate of the Chargeback Claim is $400,000.

47

The Debtor negotiated its Leases with LCN for multiple retail locations, as well as the Debtor's offices and warehouse and distribution center. In connection with those negotiations, the Debtor agreed to forego tenant improvements promised by LCN in exchange for conveyance of fixtures and trade equipment used at the warehouse. In fact, at the time these promises were made, LCN did not own the fixtures and trade equipment. LCN may have setoff claims against this Claim as a result of Debtor's rejection of the Warehouse Lease.

E.    **Avoidance Actions**

The Plan reserves all Avoidance Actions of the Debtor, including those payments to Creditors disclosed in DE 198, the Statement of Financial Affairs, Question 3 related to pre-bankruptcy payments to Creditors and/or Insiders, as well as any payments post-petition or payments that were made but not disclosed for any reason.

F,    **Shift 4 Claim**

Shift 4 served as the Debtor's prepetition merchant credit card processor and asserts a total claim against the Debtor in the amount of $2,935,947.13 as a result of losses incurred by Shift 4 resulting from orders canceled or disputed by Debtor's credit card customers. As part of the total Shift 4 claim, Shift 4 asserts a Secured Claim of $241,992.92 as a right to offset or recoup its Allowed Claim against the Shift 4 Reserve Account that it was holding prior to the Petition Date. The Debtor cannot determine the full amount of Shift 4's Allowed Claim because it does not yet know the valid amount of chargebacks disputed by customers or returns from such customers, and the Debtor is still reviewing and calculating those claims. However, Shift 4 does have a valid claim, and the Debtor believes that the Allowed Claim will significantly exceed the Shift 4 Reserve Account. Therefore, while reserving rights with respect to the full amount of Shift 4's Claim, the Debtor believes that, upon allowance of the Shift 4 Secured Claim, it will be appropriate to permit Shift 4 to offset or recoup its Allowed Secured Claim against the Shift 4 Reserve Account. Accordingly, the Plan permits this offset or recoupment, subject to the right of the Liquidation Trustee to object to the Secured Shift 4 Claim within 30 days of the Effective Date.

G.    **Miscellaneous Claims**

Any Causes of Action (as reserved in Section 5.6.2 of the Plan) based on the factual allegations in this Disclosure Statement are preserved. These include any claims for returns of security deposits of the Debtor with any party at any time. A full investigation of management decisions from the formation of the Debtor until the commencement of bankruptcy on January 6, 2021 has not been completed. The Plan preserves all claims against Debtor's pre-petition directors and officers and all claims related to the Debtor's operations, including, but not limited to claims that may be covered by the Debtor's Directors and Officers Insurance. The Plan also empowers the Liquidation Trustee to conduct such investigation, and to commence claims related to such prepetition conduct as the Liquidation Trustee deems appropriate.

The Plan preserves any Claims, broadly defined, which may exist against any Landlord based on its relationship with the Debtor and with Mr. Love.

The Plan also preserves all of the Debtor's rights under the Sales and Consulting Agreement and the Store Closing Order without alteration, as written in the Consulting Agreement and the Store Closing Order including the right to make any claims related to the Sales. These rights may be transferred to the Liquidation Trust and the Liquidation Trustee. Except as to the assignment of the Debtor's rights to the Liquidation Trust and the Liquidation Trustee, the Plan does not enhance or diminish the Debtor's right to reconcile the results of the Sales provided in the Store Closing Order and the Sales Consulting Agreement.

## IV.   ASSETS AND LIABILITIES

A.   A liquidation analysis is attached hereto as Exhibit C. In addition to the stated Claims amounts set forth in the Plan, the liquidation analysis sets forth estimated or ranges of estimated amounts for: pre- and post-confirmation Administrative Expenses, Secured Claims, Priority Claims and General Unsecured Claims. It also sets forth actual or estimated values of the Assets of the Estate as of April 3, 2021.

## V.   DETAILS REGARDING IMPLEMENTATION OF THE PLAN.

### A.   The Plan

The Plan is a liquidating plan and provides for the vesting of all remaining assets of the Debtor in a Liquidation Trust, governed by a Liquidation Trust Agreement, upon the Effective Date of the Plan. All company inventory will have been sold by the Effective Date of the Plan. The Liquidation Trustee will continue to sell any remaining assets with or without Court approval, as the case may be, or pursuant to the terms of the Plan and the Liquidation Trust Agreement until all assets are fully liquidated or abandoned. The Liquidation Trustee, upon the liquidation or abandonment of the remaining assets vested with the Liquidation Trust and payment of all expenses incurred by the Liquidation Trustee in the administration of the Liquidation Trust, will distribute the proceeds from such liquidation to the holders of Allowed Claims in order of the priorities set forth in the Plan.

The Plan further provides for the termination of all Equity Interests in the Debtor and the deemed dissolution of the Debtor from and after the Effective Date of the Plan.

### B.   Financial Information

1.   Attached as Exhibit D is a summary of the prepetition operating results of the Debtor.

2.   Attached as Exhibit E is a summary of the results of operations for the post-petition period beginning January 6, 2021 and ending March 31, 2021.

### C.   Tax ramifications for the continuing entity if the plan is confirmed are:

THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAXCONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FOLLOWING DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY. ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT SUCH HOLDER'S INDEPENDENT TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, AND FOREIGN INCOME TAX CONSEQUENCES OF THE PLAN.

Under the terms of the Plan, the Liquidation Trust Assets will be transferred to the Liquidation Trust in a taxable disposition. Any income or gain from the transfer of assets to the Liquidation Trust will flow through to the ultimate taxpaying owner or member of the transferring Debtor who will be responsible to pay any resulting tax liability. The tax consequences of the Plan, however, are subject to many uncertainties due to the complexity of the Plan and the lack of interpretative authority regarding certain changes in the tax law.

Uncertainties with regard to federal income tax consequences ofthe Plan also arise due to the inherent nature of estimates of value that will impact the determination of the amount of income or gain from the transfer of assets to the Liquidation Trust. As of the Effective Date, the Liquidation Trust must be established for the benefit of all Liquidation Trust Beneficiaries. The Liquidation Trustee will make a good faith valuation of the Liquidation Trust Assets. All parties (including, without limitation, the Liquidation Trustee and the Liquidation Trust Beneficiaries) must consistently use such valuation for all federal income tax purposes.

The Liquidation Trust is intended to qualify as a liquidation trust for federal income tax purposes. In general, a liquidation trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor" trust (i.e., a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994-28 I.R.B. 124, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidation trust under a chapter 11 plan. The Liquidation Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including the Liquidation Trustee and the Holders of beneficial interests in the Liquidation Trust) are required to treat for federal income tax purposes, the Liquidation Trust as a grantor trust of which the Holders of Liquidation Trust Interests are the owners and grantors. Although the discussion herein assumes that the Liquidation Trust would be so treated for federal income tax purposes, no ruling has been requested from the IRS concerning the tax status of the Liquidation Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidation Trust as a grantor trust. If the IRS were to challenge successfully such classification, the federal income tax consequences to the Liquidation Trust and the Holders of Liquidation Trust Interests could vary from those discussed herein, and, thus, there could be less available cash than estimated.

## VI.    LEGAL REQUIREMENTS, AS FOLLOWS:

### A.    Voting procedures

*Under the Bankruptcy Code, the only classes that are entitled to vote to accept or reject a plan are classes of claims, or equity interest, that are impaired under the plan.*

50

*Accordingly, classes of claims or interests that are <u>not</u> impaired are not entitled to vote on the plan.*

*Creditors that hold claims in more than one impaired class are entitled to vote separately in each class. Such a creditor will receive a separate ballot for all of its claims in each class (in accordance with the records of the Clerk of the Court) and should complete and sign each ballot separately. A creditor who asserts a claim in more than one class and who has not been provided with sufficient ballots may photocopy the ballot received and file multiple ballots.*

*Votes on the plan will be counted only with respect to claims: (a) that are listed on the Debtor's Schedules of Assets and Liabilities <u>other</u> than as disputed, contingent or unliquidated; or (b) for which a proof of claim was filed on or before the bar date set by the Court for the filing of proofs of claim (except for certain claims expressly excluded from that bar date or which are allowed by Court order). However, any vote by a Holder of a claim will not be counted if such claim has been disallowed or is the subject of an unresolved objection, absent an order of the Court allowing such claim for voting purposes pursuant to 11 U.S.C. § 502 and Bankruptcy Rule 3018.*

*Voting on the plan by each Holder of a claim or interest in an impaired class is important. After carefully reviewing the plan and disclosure statement, each Holder of such a claim or interest should vote on the enclosed ballot either to accept or to reject the plan, and then return the ballot by mail to the debtor's attorney by the deadline previously established by the court. Any ballot that does not appropriately indicate acceptance or rejection of the plan will not be counted.*

*A ballot that is not received by the deadline will not be counted.*

*If a ballot is damaged, lost, or missing, a replacement ballot may be obtained by sending a written request to the debtor's attorney.*

*B.      Acceptance*

*The Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by the Holders of at least two-thirds in dollar amount, and more than one-half in number, of the claims of that class which actually cast ballots. The Bankruptcy Code defines acceptance of a plan by an impaired class of equity interests as acceptance by Holders of at least two-thirds in number of the equity interests of that class that actually cast ballots. If no creditor or interest Holder in an impaired class votes, then that class has not accepted the plan.*

*C.      Confirmation*

*11 U.S.C. § 1129(a) establishes conditions for the confirmation of a plan. These conditions are too numerous and detailed to be fully explained here. Parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 process.*

*Among the several conditions for confirmation of a plan under 11 U.S.C. § 1129(a) are these:*

     1.    *Each class of impaired creditors and interest must accept the plan, as described in paragraph VI.B., above.*

     2.    *<u>Either</u> each Holder of a claim or interest in a class must accept the plan, <u>or</u> the plan must provide at least as much value as would be received upon liquidation under Chapter 7 of the Bankruptcy Code.*

D.    *Modification*

*The debtor reserves the right to modify or withdraw the plan at any time before confirmation.*

E.    *Effect of confirmation*

*If the plan is confirmed by the Court:*

*Except as provided in the Plan and in 11 U.S.C. § 1141(d), in the case of a corporation that is liquidating and not continuing its business as in this case:*

    *(a) Claims and interests will not be discharged.*

    *(b) Creditors and shareholders will not be prohibited from asserting their claims against or interests in the debtor or its assets.*

Respectfully submitted,

Loves Furniture, Inc.

By: _____
       Mack Peters
Its:    Interim Chief Executive Officer

Prepared by:

BUTZEL LONG, a professional corporation

By*: /s/ Max J. Newman* _____
Thomas B. Radom (P24631)
Max J. Newman (P51483)
Stoneridge West

52

41000 Woodward Avenue
Bloomfield Hills, Michigan 48304
Tel: (248) 258-1616
E-mail:  radom@butzel.com
        newman@butzel.com

COUNSEL TO THE DEBTOR AND
DEBTOR IN POSSESSION